[No. 29651. *En Banc.* September 17, 1945.]

CLARENCE E. JONES, *Appellant,* v. ALICE DEAN JONES, *Respondent.*[1]

[1]Reported in 161 P. (2d) 890.

· *W. H. Sibbald*, for appellant.

*Ronald Moore* and *Lester Huntington*, for respondent.

JEFFERS, J.—This is an appeal by plaintiff from an order made and entered October 31, 1944, in the case of Clarence E. Jones, Plaintiff, v. Alice Dean Jones, Defendant, No. 13096, superior court records of Cowlitz county.

The present proceeding came before the court on plaintiff's petition to again modify the interlocutory decree of divorce and the several modifications thereof heretofore entered in this cause. The order appealed from, in so far as material, recites:

"It is hereby ordered, adjudged and decreed that the general care, custody and control of the minor child, to-wit: Clair Eldon Jones, a boy, aged two years, be and hereby is awarded to the defendant, Alice Dean Jones, now Freeman,

subject to the right of the father to have said child at his home for a period of three days during the Christmas holidays, but not to include Christmas day and that the said father shall be entitled to have said child for a period of two weeks during the summer vacation at his home, and provided that the father, Clarence E. Jones, may visit said child at the mother's, Alice Dean Jones Freeman's, home at reasonable times, providing he will give the mother five days notice in advance of said visit.

"It is further ordered that the plaintiff shall continue to pay the defendant support and maintenance of said minor child at the rate of $14.00 per month until further ordered by the Court; that the original interlocutory decree and the amendments thereof are modified to the extent above set forth; and that the defendant be awarded her costs herein to be taxed."

Since the interlocutory decree of divorce was entered May 14, 1940, there have been many contentions made by the parties to this proceeding relative to the custody of their minor son, who is now about eight years of age. The respective parties have been before the superior court of Cowlitz county on various occasions, attempting to modify the decree in so far as it affected the custody of the minor. Two contempt proceedings have been started by the parties, in each of which it was claimed the other party had violated the terms of the decree in regard to the custody of the child.

The original action for divorce was instituted by the father, Clarence E. Jones. That proceeding was heard by the Honorable Howard J. Atwell, one of the judges of the superior court for Cowlitz county. At that hearing, plaintiff was represented by Edgar P. Reid. Judge Atwell, after the hearing, made and entered findings of fact, conclusions of law, and an interlocutory decree. Under that decree, each of the parties was granted a divorce. The decree further provided that the minor, who was then two years old, be awarded to his mother, Alice Jones, with instructions that the child be kept at the "Wills farm," which we assume is in Cowlitz county, until the further order of the court. The decree further provided that the child be permitted to visit his father in the home of his paternal grandparents, Charles E. and Clara Jones, on Friday, Saturday,

and Sunday of every week during the months of May, June, July, August, and September, commencing on May 24, 1940. The above provision was contained in paragraph 3 of the interlocutory decree. The decree also provided that plaintiff pay to defendant the sum of fourteen dollars per month for the support and maintenance of the minor.

On August 24, 1940, an order was entered in the cause modifying the decree in so far as paragraph 3 was concerned. The order recites that the parties have *stipulated* that the decree may be amended to read as follows:

"The defendant be, and she is hereby, awarded the general care, custody and control of the minor son of the parties hereto, to-wit: Clair Elden, a boy aged two (2) years; that said child shall be kept and maintained at any reasonable and suitable place in the Woodland district in Cowlitz county, Washington, until the further order of the court; provided, that the defendant shall keep the plaintiff advised at all times as to the place the child is being kept; and provided, however, that said child shall be permitted to visit the plaintiff at the home of its paternal grandparents, Charles E. Jones and Clara Jones, on Friday, Saturday and Sunday of every other week during the summer months of each year, namely, the months of May, June, July, August, and September, commencing on the 24th day of May, 1940."

This order was signed by the Honorable J. E. Stone, one of the judges of the superior court for Cowlitz county.

On November 18, 1940, a final decree was entered in accordance with the interlocutory decree as amended or modified by the order of August 24, 1940.

On February 16, 1941, defendant Alice Jones married Walter Freeman.

Apparently sometime in the early part of 1943, Mr. and Mrs. Freeman moved from the Woodland district onto a large dairy ranch near La Center, in Clark county, Washington, taking with them the minor son of the parties to this action. On March 29, 1943, plaintiff, by his then attorney, R. J. Boryer, filed a motion in which he asked that the mother be required to appear and show cause why she should not be adjudged in contempt for taking the minor

child out of Cowlitz county. On April 8th, Mrs. Freeman filed a petition asking that the decree as amended or modified be further modified. On July 1, 1944, the court entered an order in which it is recited:

"It appearing to the court that the parties hereto have entered into a *stipulation* wherein and whereby it is provided that paragraph three (of the interlocutory decree) as amended be further amended to read as follows:

"That the defendant be, and she is hereby awarded the custody, and control of said minor child, Clair Elden, that the defendant shall be permitted to keep and maintain said child in her home in Clark county, state of Washington, and that the defendant shall keep the plaintiff advised at all times as to the place the child is being kept, and

"Provided further, that said child shall be permitted to visit the plaintiff at the home of the grandparents, Charles E. Jones, and Clara Jones a period of six days per month during the school vacation period, namely; from the 5th to and including the 10th day, being the 5th, 6th, 7th, 8th, 9th and 10th of each month during the said vacation period, beginning the first week of May, 1943." (Italics ours.)

While the above order was not entered until July 1, 1944, the order recites that it was signed and made on April 8, 1943. The stipulation referred to in the order, admitted herein as exhibit A, was signed April 8, 1943, by Alice Dean Freeman and Ronald Moore, her attorney, and by R. J. Boryer, attorney for plaintiff.

We have set out the above record in order to show the difficulty the court has had in attempting to make a satisfactory disposition of the custody of this child. It is evident from the foregoing record that the court has not received the co-operation it should have had from either of the parties in carrying out the court's orders relative to the custody of the boy, and from the record generally we think it is problematical whether any order the court might make would meet with the approval of the parties or attain the results desired in regard to the welfare of the minor, unless the father and mother and the paternal grandparents show a different attitude.

We now come to the present proceeding. The petition upon which this proceeding was based was apparently filed

by E. H. Kohlhase, then attorney for Clarence Jones, in September, 1943. The order appealed from was made and entered by the Honorable John I. O'Phelan, visiting judge, on October 31, 1944. W. H. Sibbald appeared as attorney for Mr. Jones at the time of this hearing.

We shall hereinafter refer to Mr. Jones as appellant, and Mrs. Freeman as respondent.

Appellant contends the court erred in refusing to place in the records the report of Mrs. Swanson, upon which he claims this case was decided; in refusing to permit the interrogation of Mrs. Swanson relative to the facts she found upon her investigation; in refusing the offers of evidence of the immoral character of the mother, the photographs marked for identification, and the certified copies of the marriage license; and in entering the decree appealed from.

Appellant made no motion for a new trial, nor does he ask in his brief that a new trial be granted to him, but he asks that the minor child be awarded to him.

In view of this situation of the record, it is difficult to see just what relief we could award appellant under the first and second assignments of error, even if it be concluded the court erred in refusing to permit Mrs. Swanson's report to be introduced and refused to permit her to be interrogated relative to the investigation made by her.

While we are of the opinion the trial court invited trouble in following the procedure it did relative to the appointment of Mrs. Swanson to investigate the condition of the two homes where the child was kept, we are also of the opinion that appellant has no complaint of the action taken by the trial court, as we are satisfied his counsel and all the parties to the action understood the conditions under which the appointment of Mrs. Swanson was made, and understood that any report made by her was to be for the court alone.

The matter of the appointment of some competent woman to investigate the respective homes was first suggested by the court at the close of appellant's case, at which time the following occurred:

"THE COURT: Gentlemen, I would like very much in this class of case, where there is a contest between the parties involving children, to do as we do in Pacific county. There I have implicit confidence in one of the girls who works in the child welfare division, and usually the lawyers agree with the court, to use this girl to make a visit to the home and then make a report. I would like to have that done here. MR. MOORE: I don't know anything about it, but I have an abiding prejudice against all welfare workers. THE COURT: The only report, of course, will be as to the home. The court isn't going to the home, that is a cinch. If he did he wouldn't know anything about it at all. Have you a county nurse here? MR. MOORE: Yes. THE COURT: How about her? Do you know anything about her? MR. SIBBALD: That is outside of this county; of course, she could go down there. THE COURT: Yes, the parties would have to consent of course. The court would like to have a little help from somebody that knows. MR. MOORE: Is this to be an investigation of the Freeman home or the Jones home or both. THE COURT: Both. Of course, the examination would have to be made without notice to either party. They would have to go without notice to see what the home was like without previous information. I have found it helpful down there. Of course, you folks know the local people around here and I don't. If you don't want to do it, I won't consider it. MR. MOORE: Would you excuse me. (consult with associate.) THE COURT: If you want that done, *you will take whatever order the court makes.* MR. SIBBALD: Now listen, Mr. Moore, there isn't any idea of her knowing anything about it beforehand. THE COURT: Nobody will know about it. MR. MOORE: That is all right with us, Judge. We will leave it to you to determine who is to make the investigation. MR. SIBBALD: They (the Freemans) are in the other county and if we make an investigation, I don't want her to make the investigation. THE COURT: Oh, you can't do that. You will have to get the consent of the respective families. I don't want to consider it unless the people are consulted about having people visit the home. Before we conclude this, I will ask you gentlemen about it again. MR. SIBBALD: As far as signing that order by the court, it is agreeable with me. MR. MOORE: Yes, it is agreeable." (Italics ours.)

That was the substance of the discussion at that time. After both sides had rested and arguments had been made,

the matter of the court appointing someone to investigate the respective homes came up again. At this time, the court stated it was not going to decide the case that day, and further stated that it would like to select someone to investigate the situation for the court, saying further:

"So I would like, on account of my living away from here, the authority for the court to select some lady, either with the child welfare department or anybody in the county or the county nurse of Cowlitz county or Clark county, someone qualified to make this investigation. MR. SIBBALD: *As far as the plaintiff is concerned, I am perfectly willing to do that.* MR. MOORE: We have no objection, and I am willing to leave it up to the court to select the investigator. THE COURT: I don't know anyone here. In the county I come from I know who I would have to aid me. . . . MR. JONES (the plaintiff): It is perfectly all right. MRS. JONES (the child's grandmother): I guess it is all right. THE COURT: I won't go over the objection of anybody. Have you any objection, Mrs. Freeman? MRS. FREEMAN: No. THE COURT: Or you, Mr. Freeman? MR. FREEMAN (defendant's husband): No objection. MR. SIBBALD: But I do object to the boy being at home. MR. FREEMAN: We would have brought him, except that he has the fever. THE COURT: The court isn't going to shirk any responsibility as far as that is concerned, and if the attorneys want the court to come back, the court is willing. But I would like to have that happen. I will say this: *With the consent of the person who makes the investigation, I would be willing that the attorneys should see those reports.* There won't be any copies made; I will see to that. But I will be glad to have the attorneys see the reports. But the person making the report won't be subject to cross examination. I assume that is agreeable? MR. MOORE: I think it is, your honor." (Italics ours.)

The record does not show that Mr. Sibbald said anything in answer to the statement of the court, "I assume that is agreeable." Apparently nothing further was said at that time by any of the parties, and court was adjourned.

The proceeding was again taken up by Judge O'Phelan on October 31, 1944, at which time Mr. Sibbald stated: "If the court please, you will notice this matter comes up on a motion to adduce further testimony."

We do not find in the record before us the motion referred to by Mr. Sibbald, or the affidavit supporting it.

Mr. Moore made the following objection:

"MR. MOORE: I object on the ground for the reason that is in the nature of a motion for new trial. The affidavit in connection with this matter is not sufficient in any respect. It merely states they have some additional evidence. The rule, as I understand it is, if you have some new evidence you must come in and disclose not only who the witnesses are, but also the purport of their evidence. . . . They are coming in to open this matter again because they say they have some more testimony. . . . THE COURT: The court is conscious of the fact that under ordinary circumstances the motion would have to be granted. At the last hearing of this case, the court is definitely of the opinion it was all open and still is, and that everybody, the litigants and the attorneys agreed with the court that instead of staying over here, he might secure the services of one fitted better than he or the attorneys to advise him about these respective homes. The record shows that you [Mr. Moore] answered affirmatively and the record is silent as to the other counsel. Because of this record the court assigned Mrs. Swanson to investigate the home, and the court advised Mrs. Swanson that the report would not be available to anybody but the court."

Mr. Sibbald then called Mrs. Swanson to the stand. Mrs. Swanson, after being sworn, stated that she wished to be excused from testifying to the report she had made. The witness then made a lengthy statement as to why she should not be required to testify relative to the report.

"MR. MOORE: If the court please, it is my understanding at the time the court asked whether he might have an investigation made by a welfare worker and the report should be made to him and remain confidential, and Mr. Sibbald sat right in this chair and agreed to that whole proposition. It was the understanding at the time that we would all abide by it, as the court said how he was very anxious at that time to do that. On that ground I object to this woman being called as a witness in this case, because it is a violation by counsel of this matter. Everyone here agreed to that whole proposition. THE COURT: That is my recollection. . . . MR. SIBBALD: Are you through? I have never been guilty of such a thing of agreeing that any tes-

timony affecting the rights of my client should be given sub-rosa and that it should be kept quiet and that I would never have a chance to look at it."

Mrs. Swanson, then, over the continued objection of Mr. Moore, was permitted to testify, in answer to questions propounded by Mr. Sibbald, that she went to the home of the Jones family (where appellant makes his home) and there she saw the child; that she talked to Mr. Jones, the father, and to Mrs. Freeman, the mother of the child; that she walked around the Freeman premises; that she did not talk to the child's teacher or the welfare worker of Cowlitz county; that she went through the Freeman house and through the Jones house; and that she made a report of her investigation to Judge O'Phelan.

Mr. Sibbald then asked that he be allowed to see the report, to which Mr. Moore objected, and the court sustained the objection. Then followed a colloquy between Mr. Sibbald and the court, after which Mr. Sibbald again asked that the report be produced, which request was denied by the court. Mrs. Swanson was then asked by Mr. Sibbald, "What did you ask the boy [referring to the minor]?" Mrs. Swanson's answer was that she did not remember. Mrs. Swanson admitted that she had refused to let Mr. Sibbald see the report or talk to him about it. Mr. Sibbald was permitted to ask Mrs. Swanson the following question:

"Q. Did you advise the court in that report that you thought it would be better for the boy to stay with the mother rather than the grandparents? (Objection by Mr. Moore) . . . THE COURT: The court is conscious of the fact that objection should be sustained, but under the circumstances it is certainly not to the liking of the court. You may answer the question."

The answer was "Yes."

"Q. Did you ever let Mr. Moore or Mr. Huntington see that report? THE COURT: You may answer. A. No."

After further colloquy between the court and Mr. Sibbald, the witness was excused.

There can be no question but that the court understood all parties had agreed that the court might select some lady to investigate these homes and make a report to him; that if the investigator objected, regardless of a strictly legal right to so object, the report was to be made available only to the court; and that the investigator was not to be interrogated in regard to the report. We think the court was justified in its understanding of the agreement. However, the court, realizing the unfortunate situation presented by the contention of appellant that the court was deciding the case upon evidence not produced in court, and not available to appellant, permitted appellant to interrogate Mrs. Swanson, and by such interrogation appellant undoubtedly obtained the basis for her report and what her conclusion was as to where the child should remain.

We have set out quite fully the above record, in view of the following statement made in appellant's brief:

"Just why the court and the attorneys for respondent should object to a disclosure of the report of this woman, does not appear there, but readily leads to the conclusion that they knew exactly what was in that report, that it would be adverse to them, and, therefore, desire to suppress it."

The above is strong language, and in our opinion finds no support in the record. There is no evidence that the attorneys for respondent ever saw Mrs. Swanson's report, or ever tried to see it. Certainly the court saw it, as it was made for the court. In view of Mrs. Swanson's testimony, we are unable to understand the basis of appellant's claim that the report was adverse to respondent, and therefore the court and counsel for respondent desired to suppress it.

It may be said also that the trial court finally stated that it would not consider the report, but whether the court could or did disabuse its mind of the substance of the report, we are of the opinion that under the facts the court committed no error in refusing to permit Mrs. Swanson's report to be introduced, or in refusing to permit her to be further interrogated.

 In regard to the third assignment of error, appellant states in his brief:

"That the trial court erred in refusing pictures of the respective homes, of immorality and drunkenness of the mother, needs no argument."

The pictures referred to were pictures of the minor, of Mrs. Dolan, appellant's sister, of the grandparents, of the home of the grandparents, and of the Freemans. It should be kept in mind these pictures and the other offers were made at the hearing on October 31, 1944. We are satisfied the court did not abuse its discretion in refusing to admit the offered evidence at this hearing. It is apparent from the record that the court permitted the case to be reopened for the purpose of permitting Mr. Sibbald to interrogate Mrs. Swanson, or possibly make some showing in regard to her investigation. It does not appear that the offered pictures were not available at the previous hearing, and further it is our opinion the pictures did not reveal anything which was relevant of which the court was not apprised by other evidence.

 Appellant attempted to show the claimed immorality of respondent by offering the marriage license of Mr. and Mrs. Freeman, dated February 16, 1941, and the birth certificate of their first child, dated October 1, 1941. The court refused to permit the license and certificate to be introduced. There was no attempt to show that the child born seven and one-half months after the marriage of the Freemans was not prematurely born. We are unable to agree that the above documents, in and of themselves, were evidence of immorality of Mrs. Freeman. Again no reason appears why this evidence was not offered at the former hearing.

 Mr. Sibbald offered to show by appellant that respondent was not a fit person to have the child, because of her excessive use of alcoholic liquor. Objection was made to the offer and sustained. Appellant was on the stand at the former hearing, and testified at length. It does not appear that respondent was advised that appellant, at the

hearing in October, would attempt to go into these matters which could have been covered at the former hearing. In addition, we think the offered evidence, or the greater part of it, was merely cumulative. We are of the opinion the court did not abuse its discretion in refusing the offers. We are clearly of the opinion that appellant was not prejudiced by the refusal to admit the offered evidence.

We now come to the last assignment of error, which brings up the question of whether or not the court erred in entering the order from which this appeal is taken. We again call attention to the fact that appellant is not asking for a new trial in this case, but seeks to have awarded to him the general custody of the minor, who is now about eight years of age.

Appellant called nine witnesses, not including Mrs. Swanson.

The substance of the testimony of Beatrice Bruley, called by appellant, was that she lived about ten or fifteen miles from the Freeman home; that she had been in the home several times, and had eaten there.

"Q. Did you have a chance to observe the condition of the house? A. I don't know—A poor housekeeper—I don't know a poor housekeeper from a good housekeeper."

She further testified that she saw dirty clothes lying around.

"Q. What did you see as to the condition of the child, as to its cleanliness or otherwise? A. He was like a farm boy. I didn't pay much attention. He was just like most farm boys. . . . Q. What would you say about the class of food in the home? A. The food was all right."

Mrs. Herman Rudy testified that she lived at Woodland and had known Mrs. Freeman about seven years; that she had been in Mrs. Freeman's home, but not during the last year.

"Q. What did you find the condition in there was, as to cleanliness and so forth, the sanitary condition? . . . A. Well, I don't know. It is kind of hard to say, because with children, it is pretty hard to keep things up. Q. You have children of your own? A. Yes, I have one. Q. Did

you gain the impression as to whether or not the house was well-kept? A. It was morning, and of course, that is around the bath time and things for the baby. Q. Did you gain the impression, outside of the bath condition, as to the cleanliness of the house, as to whether or not it was kept up? A. No, because I wasn't all through the house. . . . Q. Did you see the little boy that was concerned here? A. Yes; she fixed a room for him."

The witness would express no opinion as to the condition of the boy with which we are here concerned.

Mrs. Thelma Dolan stated that she lived in Vancouver, and knew Mrs. Freeman, the Jones family and the little boy; that she had not been in the Freeman home the last two years; that she had not seen the boy in the last year; that about Christmas time in 1941 she saw him and he had no winter underwear, but in 1942 he did.

The above witnesses were called by appellant, and the testimony given was in answer to questions propounded by counsel for appellant.

Leah Bourgeois, who at the time of the hearing had been the boy's teacher since September, 1943, was called by appellant, and was asked, among others, the following question:

"Q. What did you say as to whether or not he has been kept in good clean sanitary condition? A. Well, it might be better, I think. Q. By the use of what? A. More soap and water. . . . Q. Well, I gather from this—are his clothes dirty or his hands dirty, or what? A. I would say principally his clothes. Q. I see. But his person wasn't different than any other little boy, was it? A. No."

The witness also testified that when the boy was examined by the school nurse he was found to have head lice; that a note was sent to his mother informing her of the fact; that there were other children in her room who had the same trouble.

Faye E. Huston, public health nurse in Clark county, was called by appellant and testified that she examined the boy five or six times and, on two occasions, found head lice. She further testified that the child did not look to her as though he were living in a sanitary manner; that he was not

kept very clean; that she found the members of another family with head lice at the same time she found them on this boy.

It may be stated here that respondent testified that she discovered this condition prior to receiving a notice from the teacher, was taking measures to clear it up, and it was cleared up.

Dr. James H. Lassiter, called by appellant, testified that he first examined Clair in July, 1943, at the request of the father; that he found an infection of the middle ear; that the boy was running a temperature; that he stripped Clair and found him affected with a mild case of rickets; that he saw the boy in January, 1944, at which time he showed a general improvement; that when he examined him in January, 1944, the boy had a slight infection of the bladder, probably due to nervousness. The doctor also testified the boy's tonsils were not in good condition; that rickets is a deficiency disease; and that it was not uncommon to see a mild case of rickets in this section of the county.

Dr. J. F. Christensen was called by respondent and testified that he knew Mr. and Mrs. Freeman and Clair; that two or three years prior to the hearing he removed Clair's tonsils; that he saw and examined him sometime in the fall of 1943, at which time the boy seemed in perfect condition; that he found nothing wrong with him; that he found no evidence of rickets. He further testified that he had been in the Freeman home on several occasions and found it to be kept like the average home in the country. The doctor further testified on cross-examination that at the time he examined Clair he found no throat trouble, no urinary trouble, and no evidence of rickets; that Clair was a pretty husky boy; that his person was clean and he was well dressed.

Appellant testified that he lived on a farm belonging to his father and mother, which he worked; that he had no other home. It is to this home of the paternal grandparents that Clair goes when he is permitted to visit his father. It may be admitted that the Joneses have a comfortable home, and that the grandparents are desirous of having Clair

come to live with them. The testimony also indicates that the grandparents are able and willing to care for and educate the boy.

It is the testimony of appellant and his father and mother that respondent is a poor housekeeper; that dirty clothes are left lying around the house; that when Clair comes to visit his father he is poorly clothed and apparently hungry, and his general condition indicates that he is not receiving proper food or care; that Clair seems to love his father and grandparents and cries when he has to go back to his mother.

Mr. and Mrs. Freeman operate a six hundred forty acre dairy ranch near La Center, in Clark county. At the time of the hearing they had about one hundred twenty head of stock, and were milking between seventy and eighty cows. Mrs. Freeman has three children as the result of her marriage to Mr. Freeman. It is apparent all of them are small, as the Freemans were not married until 1941. Mrs. Freeman has helped her husband with his work, especially the milking, but is not at this time working outside, and does not expect to in the future. She has a woman helping her with the housework.

Mr. Freeman testified that he knew Mrs. Freeman had the boy, Clair, before they were married, and that he expected to and was willing to take the boy into his home; that he had tried to treat him just the same as his own children; that there was no friction in the home because of the boy. He further testified that he bought what the boy needed; that he sends him to school and gives him all necessary medical attenion; that he had the boy's tonsils removed by Dr. Christensen, and paid the bill; that right after the claim was made that Clair had rickets, they took him to Dr. Christensen, who could find no evidence of the disease.

Considerable was said in oral argument in regard to Mr. Freeman punishing Clair with a little belt because he would not carry in wood, and at other times. We have carefully examined the record, and it is our conclusion that neither Mr. nor Mrs. Freeman has punished him severely or in a

manner different from that employed by many fathers and mothers. It does not appear to us that Clair was punished except when he refused to mind his mother or stepfather, and then it does not appear the punishment was unduly severe.

It appears from the testimony of both Mr. and Mrs. Freeman that they had no trouble with Clair except just after he had returned from a visit with his father at the home of his grandparents.

The following are two incidents related by Mr. Freeman. He had been interrogated as to what happened sometimes when they attempted to discipline Clair, and then he was asked:

"Q. Tell about some of these occasions? What happened when he had the discipline? A. Oh, one time he come home while we were eating breakfast. He said, 'If Walt spanks this little boy, grandpa will come down and spatter his blood and brains all over the place.' Q. What would he do when you would give him some command? A. Well, he don't have to, because he would tell his grandpa and grandma. Q. Is that the condition that exists when he comes back? A. Most generally, yes. . . . Q. Were there any instances of when his mother called him or told him to do anything and he made any remarks of this kind? A. Oh, lots of times."

Mr. and Mrs. Joe Wills were called by respondent and testified in substance that they had known Mrs. Freeman for some years, and had been at the Freeman home and had meals there; that Clair was taken care of and dressed about like other farm boys. On redirect examination Mr. Wills was asked:

"Q. What about the kind of table they set? A. Well, if it wasn't very clean, I wouldn't eat there. I am pretty particular about that. Q. What about the meals? A. All that money can buy. Q. Did the children have all they wanted? A. The table was loaded, as far as I could see. We always had plenty. Q. Were these special occasions? A. No, I wasn't invited, I just dropped in."

Mr. Wills further testified that there was plenty of meat, butter, milk, and bread; that "there was extra ice cream and stuff like that."

Mrs. Wills also testified that Mrs. Freeman took good care of her children, including Clair; that she kept his clothes clean, and that he had plenty to eat; that with these children Mrs. Freeman could not always keep her home "up to snuff." The Wills have five children, and it was Mrs. Wills' opinion that Clair was getting just as good care as her children.

Moses A. Graham, who worked for the Freemans, was called, and testified to the effect that Clair had plenty of such things as milk and butter.

We appreciate that we have set out the testimony at some length, but this cause has been before the lower court so many times, and so many charges and countercharges have been made by the respective parties to the proceeding and by and against the paternal grandparents relative to the custody of this boy, and, because of the various statements and contentions made by counsel for appellant, we felt justified in attempting in this opinion to show just what the trial court was confronted with.

Many statements are to be found in appellant's brief which, if accepted, would tend to show that respondent was immoral and cared nothing for her children. The following is an example:

"She (respondent) would leave the child alone, uncared for, run off with other men, get drunk and the father had to divorce her."

Neither the findings of the trial court who heard the divorce action nor the judgment bear out the above statement. It is impossible for us to believe that the three judges who have heard these various proceedings, and who undoubtedly had the welfare of the boy in mind, would have awarded and continued to award this minor to his mother if they had been convinced that respondent was the kind of woman appellant would have us believe she is.

We again call attention to the fact that we have in the record two stipulations, one as late as April, 1943, signed by counsel for the respective parties, agreeing that the general custody, care, and control of the minor be awarded to respondent.

■ We have so often held that the welfare of the child is the main consideration in this kind of a case, and that the trial court is better able to determine that question than this court, that it would seem no citation of authority is necessary. However, we call attention to the following statement found in the case of *Eliason v. Eliason*, 10 Wn. (2d) 719, 721, 118 P. (2d) 170:

"In cases of this nature, we give great weight to the conclusions of the trial court. Consequently, its finding will not be changed unless an abuse of discretion *patently* appears." (Italics ours.)

In the case of *Pardee v. Pardee*, 21 Wn. (2d) 25, 31, 149 P. (2d) 522, this court stated:

"The court, in arriving at what would be best for the welfare of these young children, had many things to consider—not only the fitness of the respective parties, but also the homes to which the children would be taken, the financial ability of respondent to provide for the children wherever situated, and other questions which the trial court was certainly better able to determine from observing all the witnesses than are we from reading a cold record."

■ We are also of the opinion the evidence introduced in this case was not such that we could say the conditions of the parties had so changed since the last modification as to justify this court in saying that appellant is now entitled to the general custody, care, and control of the minor.

It is true the boy is now older than he was when some of the orders were made, and perhaps this fact might appeal to a court in considering whether or not the father should be granted the right to have the boy with him more often and for longer periods than the order provides for, but the trial court undoubtedly had this fact in mind, as well as all the other facts shown by the record, and we are unable

to say that the court abused the discretion vested in it in making and entering the order appealed from.

In conclusion, may we add, in all fairness to both parties, that it does not appear to us that either of the parties is morally unfit to have the care and control of this minor.

This boy will soon have reached an age when undoubtedly a court will give some consideration to his desire as to which parent he desires to live with. If the parties really have the welfare of the boy at heart, they will endeavor to co-operate with the court and, regardless of their rights as determined by this order, will permit each other to see and have the association of the boy as much as possible, under existing conditions.

We are of the opinion that the order entered must be, and it is therefore, affirmed.

STEINERT, BLAKE, ROBINSON, SIMPSON, and MALLERY, JJ., concur.

GRADY, J. (dissenting)—This is another of the many cases brought before the courts in which the attitude of the respective adult parties towards each other has colored the inquiry as to what will best serve the welfare of a child in a determination of who shall have his custody. We have involved here a boy now of the age of about eight years whose home life and surroundings are very unhappy and whose age and understanding appear to be such that he is capable of appreciating and resenting the kind of life he is compelled to live.

It may be that this condition has been brought about in part by the expressed feelings of the father and paternal grandparents of the boy towards his mother and stepfather and that this has reflected itself in his conduct so that the latter has deemed it necessary to do some of the things complained of in his discipline, but there is a lot in the record indicating good reasons on the part of the father and grandparents in believing the boy is not being accorded proper treatment, and is not being furnished the care and attention which he should have. His mother has the care of three small children of her second marriage. The boy

does not appear to have much, if anything, in common with his stepfather, and the gap between them will no doubt grow greater if he is compelled to live in his present environment. The record indicates the mother has a great amount of work to do in addition to her household duties and the care of her small children. The boy has been neglected. The psychological effect upon him cannot be other than detrimental. It is situations of this kind that foster juvenile delinquency.

The other side of the picture is that the father of the boy is very fond of him and desires to have his son with him so that he can give him the fatherly affection and attention which is badly needed and at this very critical time in his life. His grandparents, with whom his father resides, have a very comfortable and well kept home and are deeply interested in his welfare. He would be welcome in that home, would receive excellent care and attention there, and would be in an environment in which his happiness and daily life would promote his welfare and would materially improve his whole outlook on life, both present and future. This boy needs the daily contact and society of his natural father.

I realize that we have properly said in many of our opinions that which is quoted in the majority opinion, and I am strongly of the view, that the discretion of the trial judge should seldom be disturbed in cases of this kind, but it seems to me that when this whole record is considered, and we eliminate the desire to prevail in a controverted matter so patent here and consider only the welfare of this boy, one cannot but feel that his best interests would be served by awarding his custody to his father, with appropriate visiting privileges to his mother.

BEALS, C. J., and MILLARD, J., concur with GRADY, J.