[No. 50119-4-I. Division One. January 13, 2003.]

GO2NET, INC., *Respondent*, v. C I HOST, INC., *Appellant*.

74

*Charles P. Nomellini* and *Sharon E. Cates* (of *Foster Pepper & Shefelman, P.L.L.C.*), for appellant.

*Karolyn A. Hicks* and *Carl J. Marquardt* (of *Stokes Lawrence, P.S.*), for respondent.

KENNEDY, J. — This lawsuit involves a dispute over the meaning of "impressions," a key term in Internet advertising. C I Host twice contracted with Go2Net to post advertisements on its website. The agreements provided that Go2Net would charge C I Host based on the number of "impressions" recorded by Go2Net's ad engine count. C I Host refused to pay for the service, purportedly because it suspected that Go2Net was including visits by search engines and other "artificial intelligence" agents, as well as human viewers, in its count of impressions. Go2Net filed suit against C I Host to enforce the agreements, arguing that the agreements unambiguously allowed Go2Net to count impressions in this manner. The trial court granted summary judgment to Go2Net, and denied C I Host's motion for reconsideration based on what C I Host argued was newly discovered evidence. C I Host appeals. We affirm.

## FACTS

C I Host, Inc., is a Texas-based provider of web hosting and electronic commerce consulting services. Go2Net, Inc., d/b/a Infospace, is a Seattle-based Internet service company that owns and manages a variety of websites and provides advertising services on the web. On May 15 and July 7, 2000, respectively, C I Host entered into separate advertising agreements with Go2Net, Inc., under which Go2Net agreed to display advertisements for C I Host on websites within the Go2Net network, including a website called HyperMart.[1]

Both advertising agreements provided that Go2Net would deliver C I Host a certain number of "impressions." The parties dispute the precise meaning of this term. A *Wall Street Journal* article dated November 16, 2001, discusses problems in the Internet ad industry arising from the fact that Internet publishers "use many different methods to measure ad impressions." Clerk's Papers at 139. Some count the number of times an ad is sent to a computer screen, while others count only the number of times it actually shows up on the screen. And some companies count visits by automated web crawlers and search engines as ad impressions, even though the "visits" were not made by actual human consumers. The article stated that several Internet companies were in the process of developing a standardized "single method for counting online ad 'impressions.' " *Id.* at 139. The Interactive Advertising Bureau, a group of online publishers that relies on ad revenue, recently defined the term "ad impression" as follows:

1) an ad which is served to a user's browser. Ads can be requested by the user's browser (referred to as pulled ads) or they can be pushed, such as emailed ads; 2) a measurement of

---

[1] HyperMart is also a web hosting service, and is a direct competitor of C I Host. C I Host says that it contracted to have its advertising placed on the HyperMart website because it agreed with Go2Net that persons searching for a web hosting service who accessed HyperMart's website might decide to use C I Host's enhanced web hosting services for a fee, rather than opt for the more basic services offered by HyperMart free of charge.

responses from an ad delivery system to an ad request from the user's browser, which is filtered from robotic activity and is recorded at a point as late as possible in the process of delivery of the creative material to the user's browser—therefore closest to the actual opportunity to see by the user.

http: // www.interactivejargonguide.org / Glossary / Term / impression (accessed October 25, 2002).

The May advertising agreement contemplated a one-month advertising campaign commencing on May 30, 2000, in which Go2Net would deliver approximately 385,000 "total impressions" for $4,820. The July agreement contemplated a 12-month campaign, commencing July 13, 2000, in which Go2Net would deliver 30,000,000 "total impressions" for $286,100. The agreements provided that Go2Net's equipment would count the number of impressions and would bill accordingly:

All impressions billed are based on Go2Net's ad engine count of impressions. In the event of a conflict between the number of impressions reported by Go2Net, Inc. and any remote server, the Go2Net, Inc. count stands. All payments will be based on Go2Net, Inc. ad server counts.

Clerk's Papers at 69. The agreements did not guarantee or provide for payment based on the number of "click-throughs," or times a viewer clicks on a banner advertisement and is routed to the advertiser's website. Rather, the agreements provided that:

Go2Net makes no representations or warranties relating to the results of Advertiser's advertising by means of the Internet, including without limitation, the number of page views or click-thrus such advertising will receive and any promotional effect thereof.

Clerk's Papers at 70. The term "impressions" was not explicitly defined in either agreement.

Christopher Faulkner, chief executive officer of C I Host, executed both agreements on behalf of C I Host. Each agreement contained an integration clause specifying that "[t]his Agreement supercedes and replaces any existing

written or oral agreements between Go2Net and Advertiser and may be modified only in writing signed by both parties." Clerk's Papers at 57, 61, 70. Go2Net provided Faulkner with an Internet link and password so that he could monitor the C I Host campaign.

On June 27, 2000, Go2Net employee Claire Elias sent an e-mail to Christopher Faulkner regarding the performance of the one-month May advertising campaign. Attached to the e-mail was a Go2Net "Accipiter AdManager" report, which showed how many "ad requests" the C I Host ad campaign had generated, along with the number of "clicks" and the "click rate."[2] The report defined the term "ad request" as follows:

> The request of an advertising element as a direct result of a visitor's action, as recorded by the advertisement server software. This metric is independent of content and what is actually being displayed to the visitor. An ad request does not guarantee that a visitor actually viewed an ad, it only measures the opportunity for an ad to have been delivered to the visitor. This means that an ad request will be considered valid regardless of the visitor's ability to view graphics, and whether or not the HTML document containing the ad loads to completion. In practice an ad request will be recorded when a Web server or Ad server engages in the technical process of an advertisement insertion.

Clerk's Papers at 371. Later that same day, Faulkner sent a reply e-mail to Claire Elias at Go2Net, informing her that "[w]e are very pleased with the campaigns." Clerk's Papers at 366.

The record also contains a Go2Net "Engage AdManager" report, generated on August 23, 2001. This report is similar to the previous Accipiter AdManager report in most respects. However, whereas the Accipiter report referred to "ad requests," the Engage report referred to "impressions,"

---

[2] The report defined a "click" as the "opportunity for a visitor to be transferred to a location by clicking on an advertisement, as recorded by the server." The "click rate" was defined as "the number of clicks divided by the number of ad requests and expressed as a percentage." Clerk's Papers at 371.

and contained a definition of "impression" that was identical to the definition of "ad request" in the Accipiter report. Clerk's Papers at 96-100.

C I Host's computer network system possesses the capability to automatically track and monitor all persons visiting C I Host websites. Therefore, C I Host is able to create daily, weekly, and monthly reports that reveal the number of persons that have visited a C I Host website by clicking on a particular ad carried by a particular website. However, C I Host's monitoring system does not monitor or track visits by nonhuman entities such as web crawlers or search engines, also known as "artificial intelligence." At some point during the advertising campaign, C I Host audited its traffic activity reports and discovered that the number of persons who had accessed the C I Host website by "clicking through" from ads on Go2Net websites was lower than its typical average for this type of advertising. This purportedly caused C I Host to believe that Go2Net was not delivering the number of impressions for which C I Host was being billed.

On August 7, 2000, Faulkner sent an e-mail informing Go2Net that C I Host was canceling its advertising campaign:

> We saw a huge drop in traffic to the site, the ads are not performing well . . . the CTR are pathetic . . . marketing is pulling the budget and moving it . . . I am not sure if its [sic] not a good fit or what . . . but we are pulling the campaign. Let me know immediately when it can be stopped as from August 7 on we are no longer wanting any of our ads to show up on any of the go2 networks.

Clerk's Papers at 412, 433.

Go2Net nevertheless continued to provide advertising services under the July agreement until October 2000, when it ceased to do so. C I Host had never paid a single billing, either under the May contract or the July contract. C I Host stated that it refused to pay because it disputed the number of impressions for which it was billed.

On December 21, 2000, Go2Net filed a complaint against C I Host to collect money due under the agreements. The parties commenced discovery. On August 22, 2001, C I Host submitted document requests to Go2Net. Go2Net responded by producing documents on September 25, 2001. However, Go2Net informed C I Host that one of its servers had crashed and was in the process of being rebuilt, and that Go2Net would supplement its responses if it found relevant documents on the rebuilt server.

On December 7, 2001, Go2Net filed a motion for summary judgment. The summary judgment hearing was scheduled for January 4, 2002. At the time Go2Net filed its motion for summary judgment, C I Host had provided written responses and objections to Go2Net's discovery requests, but still had not produced any documents. On December 28, 2001, C I Host produced some of the requested documents.

On December 31, 2001, counsel for C I Host faxed a letter to Go2Net's counsel noting that Go2Net's production did not include e-mails between May and July 11, 2000, and inquiring about the status of Go2Net's crashed server. C I Host also requested a CR 37 conference.

On January 2, 2002, counsel for the parties held a CR 37 conference. Go2Net's counsel agreed to ask her client about the pending documents. The next day, Go2Net produced 142 pages of documents consisting of print-outs of approximately 42 e-mail messages to and from Go2Net employees relating to C I Host. These e-mail messages showed that Go2Net had placed C I Host's ads on pages within HyperMart's "members" pages. According to C I Host, these pages are accessible only to people who have already accepted HyperMart's services. Counsel for C I Host was not able to discuss the relevance of these documents with C I Host prior to the summary judgment hearing scheduled for the following day.

C I Host's principal argument in opposition to summary judgment was that the term "impressions," as used in the agreements, was ambiguous. In support of this argument, C I Host relied on the previously mentioned *Wall Street*

*Journal* article discussing the various ways in which online publishers have measured impressions, and the declaration of Faulkner, who stated his belief that the industry-wide common usage and definition of "impressions" is "the visual display for the unique and human person to encounter." Clerk's Papers at 253. Faulkner also stated that Go2Net had misrepresented facts relating to the definition of "impressions" under the agreements.

The trial court granted Go2Net's motion for summary judgment on January 7, 2002. On January 17, 2002, C I Host moved for reconsideration on the grounds that genuine issues of material fact existed regarding the meaning of "impressions" and whether Go2Net properly performed its obligations under the agreements by placing C I Host's advertisements on HyperMart's "members" pages. C I Host also moved to amend its complaint to include allegations of fraudulent misrepresentation. C I Host presented new evidence in support of these arguments, including a declaration by a former owner of an Internet service provider stating that the term "impression" means instances in which a human requestor views an object on a website. Counsel for C I Host also claimed that the argument of Go2Net's counsel at the summary judgment hearing demonstrated for the first time that Go2Net had included visits by artificial intelligence agents in its count of "impressions." C I Host also presented the e-mails it obtained from Go2Net on the day before the summary judgment hearing, which discussed placement of C I Host ads on HyperMart member pages. C I Host also submitted a new declaration from Faulkner, who claimed that Go2Net had specifically misled him as to the placement of the ads. He also claimed, for the first time, that he did not sign the agreements, despite his earlier averments to the contrary.

The trial court requested that Go2Net respond to C I Host's motion for reconsideration. Go2Net submitted its response, and C I Host submitted a reply. The trial court denied C I Host's motion for reconsideration. C I Host now appeals.

## ANALYSIS

"On appeal from summary judgment, the standard of review is de novo and the appellate court performs the same inquiry as the trial court." *Botka v. Estate of Hoerr*, 105 Wn. App. 974, 979, 21 P.3d 723 (2001). Summary judgment is appropriate only if the pleadings, affidavits, depositions, and admissions on file demonstrate the absence of any genuine issues of material fact, and that the moving party is entitled to summary judgment as a matter of law. CR 56(c); *Clements v. Travelers Indem. Co.*, 121 Wn.2d 243, 249, 850 P.2d 1298 (1993). The court must consider the facts in the light most favorable to the nonmoving party, and the motion should be granted only if reasonable persons could reach but one conclusion. "[T]he nonmoving party may not rely on speculation, argumentative assertions that unresolved factual issues remain, or consideration of its affidavits, at face value . . . ." *Pain Diagnostics & Rehab. Assocs., P.S. v. Brockman*, 97 Wn. App. 691, 697, 988 P.2d 972 (1999), *review granted*, 140 Wn.2d 1013 (2000). If the nonmoving party " 'fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial', then the trial court should grant the motion." *Young v. Key Pharms., Inc.*, 112 Wn.2d 216, 225, 770 P.2d 182 (1989) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)). In the contract interpretation context, "[s]ummary judgment is not proper if the parties' written contract, viewed in light of the parties' other objective manifestations, has two 'or more' reasonable but competing meanings." *Hall v. Custom Craft Fixtures, Inc.*, 87 Wn. App. 1, 9, 937 P.2d 1143 (1997).

C I Host argues that summary judgment was not proper because the term "impressions," viewed in light of the agreements as a whole, the objective of the agreements, and the other objective manifestations of the parties' intent, has two or more reasonable but competing meanings.

 "The touchstone of contract interpretation is the parties' intent." *Tanner Elec. Coop. v. Puget Sound Power &*

*Light Co.*, 128 Wn.2d 656, 674, 911 P.2d 1301 (1996). Washington courts apply the "context rule" when called upon to interpret a contract:

> In Washington, the intent of the parties to a particular agreement may be discovered not only from the actual language of the agreement, but also from "viewing the contract as a whole, the subject matter and objective of the contract, all the circumstances surrounding the making of the contract, the subsequent acts and conduct of the parties to the contract, and the reasonableness of respective interpretations advocated by the parties."

*Scott Galvanizing, Inc. v. N.W. EnviroServices, Inc.*, 120 Wn.2d 573, 580, 844 P.2d 428 (1993) (quoting *Berg v. Hudesman*, 115 Wn.2d 657, 667, 801 P.2d 222 (1990)). " 'Any determination of meaning or ambiguity should only be made in the light of the relevant evidence of the situation and relations of the parties, the subject matter of the transaction, preliminary negotiations and statements made therein, usages of trade, and the course of dealing between the parties.' " *Berg*, 115 Wn.2d at 668 (quoting RESTATEMENT (SECOND) OF CONTRACTS §§ 212, 214(c) (1981)).

 "A trial court may resort to parol evidence for the limited purpose of construing the otherwise clear and unambiguous language of a contract in order to determine the intent of the parties." *Bort v. Parker*, 110 Wn. App. 561, 573, 42 P.3d 980, *review denied*, 56 P.3d 565 (2002) (citing *Berg*, 115 Wn.2d at 669). Extrinsic evidence is admissible " 'for the purpose of aiding in the interpretation of what is in the instrument, and not for the purpose of showing intention independent of the instrument.' " *Berg*, 115 Wn.2d at 669 (quoting *J.W. Seavey Hop Corp. v. Pollock*, 20 Wn.2d 337, 349, 147 P.2d 310 (1944)). "Admissible extrinsic evidence does *not* include (1) evidence of a party's unilateral or subjective intent as to the meaning of a contract word or term, (2) evidence that would show an intention independent of the contract, or (3) evidence that varies, contradicts or modifies the written language of the contract." *Bort*, 110 Wn. App. at 574. " '[U]nexpressed impressions are mean-

ingless when attempting to ascertain the mutual intentions [of the parties].' " *Lynott v. Nat'l Union Fire Ins. Co*, 123 Wn.2d 678, 684, 871 P.2d 146 (1994) (quoting *Dwelley v. Chesterfield*, 88 Wn.2d 331, 335, 560 P.2d 353 (1977)).

█ "In applying these principles, the reviewing court strives to ascertain the meaning of what is written in the contract, and not what the parties intended to be written." *Bort*, 110 Wn. App. at 574 (citing *Confederated Tribes of Chehalis Reservation v. Johnson*, 135 Wn.2d 734, 752, 958 P.2d 260 (1998)). "When considering the circumstances leading up to and surrounding a writing, a court examines the parties' objective manifestations, but not their 'unilateral or subjective purposes and intentions about the meanings of what is written.' " *Hall*, 87 Wn. App. at 9 (quoting *Lynott*, 123 Wn.2d at 684). "[M]utual intent may be established directly or by inference—but any inference must be based exclusively on the parties' objective manifestations." *Id.* (footnote omitted).

█ "Interpretation of a contract provision is a question of law only when (1) the interpretation does not depend on the use of extrinsic evidence, or (2) only one reasonable inference can be drawn from the extrinsic evidence." *Tanner*, 128 Wn.2d at 674. Therefore, "summary judgment is proper if the parties' written contract, viewed in light of the parties' other objective manifestations, has only one reasonable meaning." *Hall*, 87 Wn. App. at 9.

C I Host argues that the purpose and intent of the agreements was to place ads where they would reach human consumers with the capacity to purchase C I Host's services, and not simply to place C I Host's ads on the web and count how many times they were found by artificial intelligence agents such as web crawlers or search engines. Therefore, C I Host contends, it is more reasonable to interpret the term "impressions" to mean viewing by humans. C I Host further contends that the parties' objective manifestations of intent indicate that each attached a different meaning to the term "impressions." In support, C I Host points to the testimony of Faulkner, who stated that

he understood the term "impressions" to mean viewings by humans. C I Host contends that Faulkner objectively manifested this intent when he cancelled the Go2Net advertising campaign after discovering that the ads were generating an unexpectedly low click-through rate. Furthermore, Go2Net itself defined "impressions" in its motion for summary judgment as "the number of times an ad banner is downloaded and presumably seen by users," Clerk's Papers at 46, but later changed its tune and argued that "impressions" could include the number of times both humans and artificial intelligence agents viewed the ads.

■ Although it may seem counterintuitive in light of undisputed evidence in the record that there is no single industry-wide accepted definition of "impressions," so that the term would seem to be inherently ambiguous, C I Host's arguments are ultimately unpersuasive. This is because the agreements plainly provide that "[a]ll impressions billed are based on Go2Net's ad engine count of impressions," and that "[i]n the event of a conflict between the numbers of impressions reported by Go2Net, Inc. and any remote server, the Go2Net, Inc. count stands." *Id.* at 56, 60, 69. This language shows an objective mutual intent to allow Go2Net's method of counting impressions to prevail, and it effectively preempts any arguments over the definition of "impressions." Go2Net did exactly what the agreement said it could do: it billed C I Host based on Go2Net's ad engine count of impressions. Had C I Host wished to ensure that Go2Net's ad engine was counting only the number of times a human actually viewed the ad, it should have contracted to count the number of impressions itself, or specified its own definition of "impressions" in the agreements. C I Host is effectively asking the court to alter the plain language of the agreement to read that "all impressions billed are based on Go2Net's ad engine count of impressions, *and Go2Net's ad engine shall count only the number of times a C I Host ad is actually sent to a computer screen.*" This is not a reasonable reading of the agreements, because it is based on a definition of "impressions" that the parties did not express,

and it contradicts the plain meaning of the clause providing that Go2Net's count of impressions will stand.

Furthermore, before C I Host signed the second contract, Go2Net sent Faulkner the Accipiter AdManager report that contained a definition of "ad request" that is much broader than the definition advanced by C I Host. The e-mail from Elias to Faulkner, and Faulkner's e-mailed reply, prove that Faulkner received this report on June 27, 2000, before entering into the year-long advertising agreement. Although the Accipiter report referred to "ad request" rather than "impression," there is no doubt that the report put Faulkner on notice of the way Go2Net was counting its product. This is further evidence that the parties did not objectively agree to define "impressions" in the manner advocated by C I Host.

The fact that Faulkner canceled the ad campaign after discovering an unexpectedly low click-through rate is not objective evidence of the parties' alleged intent to count only visits from human viewers as "impressions." Rather, it simply indicates C I Host's intent not to spend any more money on an unsuccessful ad campaign. The *Wall Street Journal* article submitted by C I Host demonstrates that, at the time the parties entered into the advertising agreements, there was no universally agreed-upon definition of impressions in the Internet advertising industry. However, that does not render these particular agreements ambiguous; it merely indicates that there is more than one way to count impressions, including the method employed by Go2Net. This only serves to emphasize the importance of specifying in the contract how impressions are to be counted. Here, the parties agreed to bill based on Go2Net's ad engine count of impressions. Similarly, although Go2Net's motion for summary judgment included a definition of "impressions" that was similar to the one advocated by C I Host,[3] this does not change the plain fact that C I Host agreed to be billed based on Go2Net's ad engine count

---

[3] We asked counsel for Go2Net to explain this discrepancy during oral argument for this appeal. Counsel could not do so.

of impressions, in whatever way the ad engine was set up to count them. The agreement is not ambiguous.

C I Host next argues that the trial court abused its discretion in refusing to vacate the summary judgment order in light of "newly discovered evidence" submitted in conjunction with C I Host's motion for reconsideration. This evidence included (1) internal Go2Net e-mails concerning the placement of C I Host's ads within the HyperMart network, and (2) a new declaration from Faulkner claiming that his signature on the agreements was forged, and that a Go2Net employee made material misrepresentations to C I Host regarding the definition of "impressions" and the placement of the ads within restricted portions of the HyperMart website.

■ A trial court's ruling on a motion for reconsideration is reviewed for an abuse of discretion. *Weems v. N. Franklin Sch. Dist.*, 109 Wn. App. 767, 777, 37 P.3d 354 (2002). A trial court abuses its discretion when its decision is manifestly unreasonable or based upon untenable grounds or untenable reasons. *Id.*

■ CR 59(a)(4) authorizes a court to vacate a verdict or other decision on the basis of "[n]ewly discovered evidence, material for the party making the application, which he could not with reasonable diligence have discovered and produced at the trial." A new trial may be granted on the basis of newly discovered evidence only if " 'the evidence (1) will probably change the result of the trial; (2) was discovered since the trial; (3) could not have been discovered before trial by the exercise of due diligence; (4) is material; and (5) is not merely cumulative or impeaching.' " *Holaday v. Merceri*, 49 Wn. App. 321, 329, 742 P.2d 127 (1987) (quoting *State v. Evans*, 45 Wn. App. 611, 613, 726 P.2d 1009 (1986)). "Failure to satisfy any one of these five factors is a ground for denial of the motion." *Id.* at 330.

C I Host has failed to show that these items qualify as "newly discovered evidence." First, the e-mails were produced to C I Host's counsel on the day before the summary judgment hearing and before entry of the court's order.

Therefore, the evidence was not "discovered since the trial" and it fails under the second prong of the test.

■ ■ C I Host argues that the evidence should be treated as newly discovered because counsel did not have an opportunity to discuss the e-mails with her client prior to the summary judgment hearing. Certainly counsel for C I Host was put in a difficult position by the late disclosure of the e-mails. Counsel could have moved for a continuance, but did not, choosing instead to proceed with the summary judgment hearing as scheduled. We decline the invitation to treat the evidence as newly discovered.

Nor does the record suggest that Go2Net deliberately tried to hide these documents. In September 2001, Go2Net informed C I Host that one of its servers had crashed and that Go2Net might need to supplement its responses when the server was repaired. When counsel for C I Host asked about the status of the server at the CR 37 conference, counsel for Go2Net looked into the matter and produced the documents the next day. Although Go2Net should have produced these documents as soon as they were available, rather than waiting until C I Host asked about them, this does not change the fact that C I Host had the documents in hand prior to the summary judgment hearing and could have sought a continuance to pursue the matter. If C I Host had asked for a continuance, and the trial court denied it, C I Host's argument on this issue would be more persuasive.

The declaration of Faulkner also fails to qualify as newly discovered evidence. If Faulkner believed that his signature on the agreements was forged, he has not explained why he did not raise the issue prior to summary judgment. Neither does he explain the glaring conflict between this new claim and previous testimony in which he stated that he executed the agreements. Similarly, there is no apparent reason why Faulkner could not have testified previously regarding his alleged conversation with Go2Net employee Claire Elias concerning the meaning of "impressions." There is no abuse of discretion where the trial court refuses to consider an untimely affidavit concerning matters that occurred well

before the suit was brought. *Brown v. Peoples Mortgage Co.*, 48 Wn. App. 554, 560, 739 P.2d 1188 (1987).

One possible exception is Faulkner's declaration as it pertains to the new allegations of fraudulent misrepresentation with respect to the placement of the ads within the HyperMart network. Faulkner apparently did not know about this until he saw the e-mails, which were disclosed by Go2Net one day before the summary judgment hearing. Therefore, he could not have testified on this subject in his previous declarations. The agreements provided that Go2Net would run C I Host's advertisements on the World Wide Web, and also within the Go2Net network. Hyper-Mart and its member pages are within the Go2Net network. Faulkner testified that he believed the ads were to run on HyperMart's front page. But the agreements do not say anything specific about the ads appearing on the HyperMart front page. Furthermore, as discussed above, counsel for C I Host did obtain the e-mails prior to the summary judgment hearing and did not seek a continuance in order to discuss the potential impact of this new evidence and to modify the case strategy accordingly.

C I Host also argues that the court erred in denying its motion for summary judgment under CR 59(a)(7) because the contract term "impressions" is ambiguous. Under CR 59(a)(7), a trial court may vacate its decision, on motion of the aggrieved party, on the grounds that the decision was "contrary to law." According to C I Host, the grant of summary judgment in favor of Go2Net was contrary to law because a genuine issue of material fact exists regarding the meaning of "impressions" in the agreements. However, as discussed above, the agreements specified that C I Host would be billed based on "Go2Net's ad engine count of impressions," and the extrinsic evidence submitted by C I Host does not change the result.

C I Host relies heavily on the declaration of Robert S. Apgood, which it presented for the first time in its motion for reconsideration. Apgood, an attorney in the same law firm as that of C I Host's counsel, and the former owner of

an Internet service provider, testified that the term "impressions" refers to instances in which a human views an object on a website. However, Apgood's testimony cannot change the fact that the agreements specified that C I Host would be billed based on "Go2Net's ad engine count of impressions." In addition, Apgood's declaration was not presented to the trial court at the summary judgment hearing, and C I Host has not shown that the declaration could not have been obtained earlier. Therefore, it does not qualify as newly discovered evidence. "The realization that [the] first declaration was insufficient does not qualify the second declaration as newly discovered evidence." *Adams v. W. Host, Inc.*, 55 Wn. App. 601, 608, 779 P.2d 281 (1989).

We affirm the trial court's grant of summary judgment to Go2Net, and its denial of C I Host's motion for reconsideration.

BECKER, C.J., and AGID, J., concur.

Reconsideration denied February 21, 2003.