[No. 53148-4-I.   Division One.   March 22, 2004.]

HEARST COMMUNICATIONS, INC., *Respondent*, v. SEATTLE TIMES COMPANY, *Petitioner*.

---

*Douglas C. Ross, Marvin L. Gray, Jr.,* and *Stephen M. Rummage* (of *Davis Wright Tremaine, L.L.P.*), for petitioner.

*Kelly P. Corr, Guy P. Michelson,* and *Kelsey L. Joyce* (of *Corr Cronin, L.L.P.*), for respondent.

ELLINGTON, J. — Since 1981, the Seattle Times Company and Hearst Communications have been parties to a joint operating agreement (JOA) whereby the Seattle Times Company (the Times) publishes both *The Seattle Times* and Hearst's newspaper, the *Seattle Post-Intelligencer*. The agreement contains an escape clause, under which either of the parties may issue a loss notice to trigger termination of the JOA after three consecutive unprofitable years. A lengthy strike contributed to operating losses, and the Times invoked the escape clause in 2003. Hearst filed this lawsuit, seeking damages for breach of the JOA and a declaration that a loss notice cannot be based upon losses

from a force majeure event such as a labor strike. The Times contends that under the plain terms of the agreement, strike losses are no different from any other losses for purposes of the escape clause. Under the established rules for contract interpretation, we are constrained to agree. We therefore reverse the summary judgment entered in favor of Hearst, and remand for entry of judgment on this issue in favor of the Times.

## BACKGROUND

*History of Joint Operating Agreements and the Newspaper Protection Act.* Beginning during the Great Depression, some newspaper publishers negotiated agreements to reduce production costs by combining the business operations of previously competing newspapers, while maintaining separate and independent editorial operations.[1] In 1969, the United States Supreme Court put these arrangements in jeopardy when it affirmed a district court decision holding that a joint operating agreement in Tucson, Arizona constituted illegal price-fixing and conspiracy to monopolize in violation of the Sherman Act, 15 U.S.C. §§ 1-17, and Clayton Act, 15 U.S.C. §§ 12-27.[2]

Congress then enacted the Newspaper Protection Act (NPA), which created a limited exemption from these antitrust laws for newspaper joint operating agreements:

> In the public interest of maintaining a newspaper press editorially and reportorially independent and competitive in all parts of the United States, it is hereby declared to be the public policy of the United States to preserve the publication of newspapers in any city, community, or metropolitan area where a joint operating arrangement has been heretofore entered into

---

[1] *See Comm. for an Indep. P-I v. Hearst Corp.*, 704 F.2d 467, 473 (9th Cir. 1983).

[2] *Id.; see also Citizen Publ'g Co. v. United States*, 394 U.S. 131, 89 S. Ct. 927, 22 L. Ed. 2d 148 (1969).

because of economic distress or is hereafter effected in accordance with the provisions of this chapter.[3]

The NPA afforded limited antitrust immunity to the parties to existing JOAs, and provided a process by which future agreements could gain the same protection:

> It shall be unlawful for any person to enter into, perform, or enforce a joint operating arrangement, not already in effect, except with the prior written consent of the Attorney General of the United States. Prior to granting such approval, the Attorney General shall determine that not more than one of the newspaper publications involved in the arrangement is a publication other than a failing newspaper, and that approval of such arrangement would effectuate the policy and purpose of this chapter.[4]

*History of Times/P-I Joint Operating Agreement.* Since 1896, *The Seattle Times* and *Seattle Post-Intelligencer* have operated as the only metropolitan daily newspapers in Seattle.[5] The *P-I* began losing ground to the *Times* in terms of circulation and advertising revenue in the late 1960s, and in 1981, owners of the two papers applied to the United States Attorney General for approval of a joint operating agreement.[6] The Attorney General approved the agreement, as did the Ninth Circuit Court of Appeals.[7]

## FACTS

The *Times/P-I* JOA was formed in 1981. The Times owns the printing plant, and is responsible for printing, promoting and distributing both newspapers, as well as selling advertising and circulation for both. The newspapers are separately owned and managed, and maintain independent

---

[3] 15 U.S.C. § 1801 (1970); *see also Comm. for an Indep. P-I*, 704 F.2d at 473-74 (explaining legislative history in detail).

[4] 15 U.S.C. § 1803(b) (1970).

[5] *Comm. for an Indep. P-I*, 704 F.2d at 469-70.

[6] *Id.*

[7] *Id.* at 473-74.

news and editorial departments. Excluding news and editorial expenses, for which each paper is separately responsible, the Times and Hearst now share the total operating revenues and expenses of both papers in a 60/40 ratio.[8] Each receives its share of the excess of revenues over expenses (or must fund its share of any shortfall) in this ratio. These revenues and expenses are referred to as "agency revenues" and "agency expenses."[9] The excess of revenues over expenses is referred to as the "agency remainder." This is the amount distributed to each paper, in the agreed ratio, for purposes of satisfying its own newsroom expenses. Joint operations will continue until 2083 unless the parties agree to terminate the JOA by setting a "newspaper cessation date," or unless one party invokes the "escape clause" in section 7.1.4.

The escape clause permits either party to terminate the agreement after three consecutive years in which its share of the agency remainder is insufficient to pay its own news and editorial expenses. A party invokes the escape clause by issuing a loss notice, stating its intent to establish the newspaper cessation date "at the earliest possible opportunity."[10] The parties must then cooperate to bring about the cessation date. If they are unable to do so, the agreement terminates automatically, 18 months after the loss notice.

The agreement also contains a force majeure clause, section 6.2, which provides that neither party shall be liable to the other for any failure of performance resulting from causes outside the control of the party, such as acts of war or labor strikes.

In November 2000, a strike by The Newspaper Guild and the Teamsters affected both papers. Because the strike caused significant increases in expenses and decreases in revenues, the Times was unable to cover its news and

---

[8] The JOA was amended in 1999 to permit the Times to move from an afternoon to a morning publication and to increase Hearst's share of the revenues.

[9] "Agency" refers to the joint operating arrangement.

[10] Clerk's Papers at 102.

editorial expenses in 2000 and 2001. The Times also came up short in 2002, although this loss is not ascribed to the strike.

In 2003, Hearst filed a lawsuit alleging the Times breached the JOA and breached its fiduciary duties.[11] Hearst also sought a judgment declaring that the Times could not invoke the escape clause because its losses were the result of force majeure events, including the strike, the September 11 terrorist attacks, and the severe economic recession in 2002. The Times filed a loss notice the following day. After a course of discovery, the parties filed cross-motions for partial summary judgment on a single question: whether the force majeure clause prevented the Times from issuing a loss notice based in part on its 2000 losses, given the Times' acknowledgment that but for the strike, it would have suffered no loss that year. The Committee for a Two-Newspaper Town (the Committee) was permitted to intervene, and filed a brief supporting Hearst's motion.

Evidence was submitted regarding JOA negotiations and the parties' conduct under the agreement. Based in large part upon the extrinsic evidence, the trial court granted summary judgment to Hearst, ruling that the force majeure clause precludes a loss notice based on strike losses.[12] We granted discretionary review.

## DISCUSSION

Our review is de novo.[13] Summary judgment is appropriate only where there are no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law.[14]

---

[11] Hearst's complaint alleges the Times' 2002 losses were unnecessarily incurred for the purpose of creating a third consecutive year of losses.

[12] The parties later agreed the same result would apply to the Times' 2001 losses, and a stipulated order granted Hearst summary judgment as to that year as well.

[13] *Go2Net, Inc. v. C I Host, Inc.*, 115 Wn. App. 73, 83, 60 P.3d 1245 (2003).

[14] *Id.*

■■ Courts faced with questions of contract interpretation must discern the intent of the contracting parties, and may consider evidence extrinsic to the contract itself for that purpose, even when the contract terms are not themselves ambiguous.[15] If relevant, such evidence may include the subject matter of the contract, the circumstances under which the agreement was made, the parties' conduct thereafter, and the reasonableness of the interpretations urged by each.[16]

Such extrinsic evidence may not, however, be used to "vary, contradict, or modify" the written terms, to show an intention independent of the contract, or to show a party's unilateral or subjective intent as to the meaning of contract words or terms.[17] Thus, extrinsic evidence is relevant only to establish the parties' mutual intent in arriving at their agreement, and may be used only to illuminate the words used in the contract, not to vary them. Where extrinsic evidence is needed, summary judgment is rarely appropriate: "Interpretation of a contract provision is a question of law only when (1) the interpretation does not depend on the use of extrinsic evidence, or (2) only one reasonable inference can be drawn from the extrinsic evidence."[18]

Two clauses of the JOA are the focus of the inquiry here. The force majeure clause provides a complete defense to liability if one party is unable to perform its obligations under the contract because of circumstances outside its control, such as a labor strike:

> *Neither party shall be liable to the other for any failure or delay in performance under this Agreement, occasioned by* war,

---

[15] *Berg v. Hudesman*, 115 Wn.2d 657, 667-68, 801 P.2d 222 (1990).

[16] *Id.*

[17] *Hollis v. Garwall, Inc.*, 137 Wn.2d 683, 695, 974 P.2d 836 (1999).

[18] *Tanner Elec. Coop. v. Puget Sound Power & Light Co.*, 128 Wn.2d 656, 674, 911 P.2d 1301 (1996) (citing *Scott Galvanizing, Inc. v. N.W. EnviroServs., Inc.*, 120 Wn.2d 573, 582, 844 P.2d 428 (1993)); *see also Berg*, 115 Wn.2d at 667-68 (adopting *Restatement (Second) of Contracts* § 212 (1981), which provides: "A question of interpretation of an integrated agreement is to be determined by the trier of fact if it depends on the credibility of extrinsic evidence or on a choice among reasonable inferences to be drawn from extrinsic evidence.").

riot, government action, act of God or public enemy, damage to or destruction of facilities, *strike*, labor dispute, failure of supplier or workers, inability to obtain adequate newsprint or supplies, or any other cause substantially beyond the control of the party required to perform.[19]

The escape clause provides for termination of the agreement if either party experiences three consecutive years of losses:

Prior to the Newspaper Cessation Date, *if at any time hereafter there are any three (3) consecutive years in which either of the parties does not receive a distribution of Agency Remainder under Section 4.1 adequate to pay the expenses of its news and editorial operations* for each of such years, determined in accordance with Appendix C hereto, such party may, at any time within nine (9) months following the close of such three (3) consecutive years, give the other party notice of such party's election to establish the Newspaper Cessation Date pursuant to Section 3.5 hereof at the earliest possible opportunity [the "loss notice"]. . . . The date upon which such notice shall be given shall be the "Loss Notice Date." Immediately upon the occurrence of the Loss Notice Date, both parties shall cooperate to effect, and use their best efforts to bring about, the Newspaper Cessation Date at the earliest possible time. Time shall be of the essence of this provision, and each party hereby agrees and commits that as expeditiously as possible such party will take all action within its control that may be necessary or desirable to cause the parties to be in a position to effect the cessation of publication by the Agency of one of the Newspapers. In the event that the parties shall not have caused the Newspaper Cessation Date to occur within eighteen (18) months of the Loss Notice Date, this Agreement shall thereupon terminate immediately.[20]

These two clauses do not reference one another and have no apparent relationship. The force majeure clause excuses liability for delay or failure of performance under the agreement, so long as the delay or failure is occasioned by a force majeure event. The Times argues that nothing in the

---

[19] Clerk's Papers at 49, 100 (emphasis added).

[20] Clerk's Papers at 102 (emphasis added).

escape clause requires any performance that might create liability, and therefore there is nothing to trigger the defense of force majeure. Hearst contends it does face liability,[21] because of the obligation to cooperate in bringing about a cessation date. Hearst argues this obligation is "occasioned by" the strike, because the Times' loss notice was occasioned by the strike. Hearst therefore argues the force majeure clause relieves it of the obligation to negotiate a newspaper cessation date.

The crux of Hearst's argument lies in the supposed consequence of invoking the defense of force majeure: Hearst contends that if it is relieved of the obligation to negotiate a newspaper cessation date, *no cessation date arises*. From this, Hearst asks us to conclude that the agreement does not permit a loss notice based on strike losses.

This is not a reasonable reading of the agreement. Assuming that a failure to cooperate in setting a cessation date creates a liability under the agreement, and consti-tutes a failure of performance occasioned by the strike,[22] then Hearst may decline to perform its obligation to coop-erate without incurring liability to the Times. But the force majeure clause protects against liability; it does not cancel the loss notice. By the plain terms of the JOA escape clause, if the parties do not agree upon a newspaper cessation date, the JOA terminates automatically 18 months after the loss notice. The agreement thus expressly anticipates the pos-sibility that the parties will be unable (for whatever reason) to agree upon a cessation date, and provides an automatic remedy. Neither Hearst nor the Committee explain why this provision does not control.

Hearst also makes several arguments based upon the alleged mutual intent of the parties in forming the JOA.

---

[21] Hearst defines "liable" as "[b]ound or obliged in law or equity; responsible; chargeable; answerable; compellable to make satisfaction, compensation, or restitution." *See* Resp't's Br. at 38 (quoting BLACK'S LAW DICTIONARY 824 (5th ed. 1979) *as quoted in Wash. Pub. Ports Ass'n v. Dep't of Revenue, 148 Wn.2d 637, 647, 62 P.3d 462 (2003)).*

[22] Both these propositions are challenged by the Times.

First, Hearst asserts the parties intended that the agreement would terminate only if and when the Seattle marketplace is unable to support two newspapers, and that the agreement cannot, consistent with this intent, be interpreted to allow one party to terminate the JOA when the market would still support two newspapers. Under this interpretation, because strike losses do not evidence a changed market, the Times cannot invoke the escape clause.

■■■■ The difficulty is that the parties' agreement contains no expression of this alleged mutual intent. Hearst points first to the parties' declaration in the JOA expressing "the firm belief . . . that the continued publication of at least two newspapers of general circulation, editorially and reportorially separate and independent, is of paramount importance to the citizens of Seattle and its environs."[23] It is undisputed that this premise was fundamental to formation of the JOA. The parties' declaration makes no mention of the marketplace, however, and the agreement clearly permits either party to terminate the agreement and escape a losing enterprise. A mutual desire to preserve two editorial voices in Seattle does not illuminate the parties' intent as to the accounting process for determining losses that may trigger termination.

Further, if the parties intended the escape clause to be effective only at the point Seattle will no longer support two newspapers, then unless the marketplace shrinks, no loss, regardless of amount or cause can trigger the escape clause. But as Hearst acknowledges, however, the escape clause can be triggered by losses from misguided business decisions, regardless of the general condition of the marketplace.

Instead, Hearst contends the marketplace limitation somehow finds expression in the force majeure clause, so that only losses from force majeure events are disqualified. This involves a considerable refinement in the alleged

---

[23] Clerk's Papers at 23.

marketplace test, and again, nowhere in the agreement can we find support for this reading. If the parties intended the marketplace test to control—a matter much debated here— their intent lies entirely outside the agreement they wrote, and we are not at liberty to rewrite their agreement to give it effect.[24]

Hearst next argues the parties never intended that losses caused by force majeure events would "count" for purposes of the escape clause. For this argument, Hearst relies principally upon extrinsic evidence of the parties' contract negotiations and course of performance. We will briefly review this evidence, because it has received a great deal of attention in the parties' briefs. But extrinsic evidence cannot assist the court in interpreting an agreement unless it is offered to illuminate language in the contract,[25] and the JOA contains no such language.

The escape clause was vigorously negotiated. It was insisted upon by the Times and steadfastly resisted by Hearst. It is undisputed that in their long negotiations, the parties never discussed whether losses caused by strikes or other force majeure events should be disqualified from triggering the escape clause. The agreement provides that the clause is triggered by three years "in which either of the parties does not receive a distribution of Agency Remainder under Section 4.1 adequate to pay the expenses of its news and editorial operations."[26] The clause thus incorporates terms that are defined in great detail and used throughout the agreement—notably, "agency remainder." Agency remainder is calculated simply by adding up the joint operating revenues and subtracting the allowed operating expenses. Nothing in this calculation provides for different treatment of losses caused by force majeure events.

---

[24] *See Lynott v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 123 Wn.2d 678, 684, 871 P.2d 146 (1994).

[25] *Hollis*, 137 Wn.2d at 695.

[26] Clerk's Papers at 102. Guidelines for determining news and editorial expenses are set forth at length in the agreement.

Hearst contends this is because of its belief that the force majeure clause already excluded such losses—that is, Hearst did not have to bargain for protection it already had. This belief, however, is not based on any language in the agreement. A party's unexpressed intent has no relevance, even where extrinsic evidence is otherwise appropriate.[27] In addition, the parties agreed the escape clause did not take effect until the fourth year of JOA operations, in part because of concern about labor unrest. If the force majeure clause already precluded strike losses from triggering the escape clause, it would presumably have been unnecessary to bargain for their exemption in the first few years.

Further, the parties have treated strike losses like any other losses in calculating agency remainder. For example, when agency revenues were insufficient, as a result of the strike, to pay agency expenses in November and December 2000, and January 2001, Hearst paid its share of the shortfall, indicating that agency remainder is calculated without regard to the financial impact of a strike for purposes of article 4 of the agreement, which controls distribution of revenues and sharing of deficiencies. The escape clause incorporates article 4.

Hearst cites three examples of the Times' conduct to support its intent argument: the Times represented to its bankers that the financial impact of the strike was an extraordinary one-time occurrence;[28] the Times expressed to officials at the *P-I* that the force majeure clause gave the Times discretion to elect to publish only one newspaper during the strike if it became impossible or impracticable to publish both;[29] and the Times invoked the force majeure clause after it exceeded the JOA cap on charitable contri-

---

[27] *Lynott*, 123 Wn.2d at 684 (quoting *Dwelley v. Chesterfield*, 88 Wn.2d 331, 335, 560 P.2d 353 (1977)).

[28] The Times admits the 2000 and 2001 losses resulted from the strike.

[29] This appears consistent with the force majeure clause: the contract obligates the Times to publish two newspapers; if performing that obligation was made "impossible or impracticable" due to the strike, the force majeure clause would insulate the Times from liability to Hearst.

butions in 2000 and 2001. The only example to which Hearst devotes any argument, however, is the Times' response when it realized it had exceeded the contribution cap.

The cap limits the charitable contributions that may be included in agency expenses to two percent of projected agency profit. For the years 2000 and 2001, the Times exceeded the cap. After each of those years, a Times employee wrote a memo "to file" concerning the effect of the force majeure clause on the failure to comply with the cap. Referring to its failure in 2000, the memo states, "Due to the labor strike and its repercussions, Seattle Times Company was unable to meet the requirements of Section B.1.12 [the cap limit]. However, in accordance with [the force majeure clause], there is no associated liability to The Hearst Corporation."[30] The employee used different language in 2001: "[I]n accordance with [the force majeure clause], the strike and its effect fall under the definition of force majeure; therefore, the agency limitation provision should not apply."[31]

Hearst argues these memos and related conduct by the Times amount to an acknowledgement that force majeure events affect agency remainder calculations. The first memo, however, appears to be a straightforward analysis of liability under the force majeure clause (the contract imposes an obligation to limit charitable contributions to two percent, the Times failed to perform the obligation as a result of the strike, and the force majeure clause operates as a defense to liability for breach; thus, "there is no associated liability to . . . Hearst"). This has nothing to do with calculating agency remainder. The second memo, stating that "the agency limitation provision should not apply" because of the strike, seems to be an incorrect analysis, but does not convey that agency remainder is calculated differently for force majeure events. The Times

[30] Clerk's Papers at 843.

[31] Clerk's Papers at 860.

responds that the memos were written by an accounting employee, that its management never adopted the positions described in the memos, and that its publisher offered to compensate Hearst when advised of the error.

If this evidence were relevant, it would raise questions of fact; it would not support summary judgment for Hearst. But it is not relevant. Extrinsic evidence may not be used to demonstrate an intent independent of the contract; it may only illuminate the words of the agreement. Hearst is unable to tie its argument to language in the JOA. If the parties intended to require that agency remainder be calculated differently when strike losses affect agency expenses, they did not say so. Instead, they defined the specific elements of the calculation (agency remainder, consisting of agency revenues less agency expenses, and news and editorial expenses) once, in great detail, for the entire agreement, and embedded these terms without qualification in the escape clause.

In essence, Hearst asks us to rewrite the JOA by revising the escape clause, so that a loss notice may be issued "if at any time hereafter there are any three consecutive years *that are not affected by a force majeure event* in which either of the parties does not receive a distribution of Agency Remainder adequate to pay its expenses." Likely this would have been a reasonable limitation. Whatever we may now wish, however, this is not what the parties agreed. The JOA cannot be read to disqualify strike losses from calculations pertaining to the escape clause without varying, contradicting, or modifying the language in the agreement. We are not at liberty to revise the parties' contract.[32]

Intervenor Committee for a Two-Newspaper Town (the Committee), argues that the court should give effect to the interpretation that favors the public interest:

---

[32] *Seattle Prof'l Eng'g Employees Ass'n v. Boeing Co.*, 139 Wn.2d 824, 833, 991 P.2d 1126 (2000) (" 'Courts are not at liberty, under the guise of reformation, to rewrite the parties' agreement and "foist upon the parties a contract they never made." ' " (quoting *Seattle Prof'l Eng'g Employees Ass'n v. Boeing*, 92 Wn. App. 214, 220, 963 P.2d 204 (1998))).

Under these circumstances, the ruling sought by the *Times* in this appeal would validate and authorize the result both the NPA and Washington State's public policy seek to avoid—the reduction of independent media, and especially daily newspapers, voices in one media market. While this result might, under some circumstances, be lawfully obtained, the *Times* should have to bear a heavy burden in establishing that this result is lawful and appropriate in the instant case.[33]

The Committee provides sound reasons (and considerable authority) for an inarguable position: that having two independent newspapers is profoundly in the public interest. For example, the Committee cites the declaration of policy in the NPA:

In the public interest of maintaining a newspaper press editorially and reportorially independent and competitive in all parts of the United States, it is hereby declared to be the public policy of the United States to preserve the publication of newspapers in any city, community, or metropolitan area where a joint operating arrangement has been heretofore entered into because of economic distress or is hereafter effected in accordance with the provisions of this chapter.[34]

The Committee contends that both parties' interpretations are reasonable and trial is necessary to ascertain their mutual intent. The task of selecting among reasonable interpretations is indeed for the trier of fact. But this is so only if both interpretations are reasonable readings of the language in the agreement, which is not the case here. The Committee does not contend that considerations of public policy, however powerful, can modify or contradict a clear agreement.

Because the interpretation urged by Hearst requires us to vary the terms of the agreement, while the Times'

---

[33] Br. of Intervenor at 7.

[34] 15 U.S.C. § 1801 (1970). In light of this policy, Congress authorized the United States Attorney General to approve joint operating agreements after making two required findings: (1) that one of the newspapers is "failing"; and (2) that the proposed JOA "effectuate(s) the policy and purpose" of the NPA. 15 U.S.C. § 1803(b) (1970). The Attorney General's approval is an indication that the provisions of the JOA, including the escape clause, are consistent with the public interest protected by the NPA.

interpretation does not, there is no question for the trier of fact to answer, and no way for the court to give effect to the legitimate public policy concerns identified by the Committee.

## CONCLUSION

The Times' loss notice represents a sad moment for Seattle and for journalism. The advantage of two daily newspapers is a rare state of affairs today, and the temptation is great to rewrite the JOA, in the hope we will somehow preserve both. But this we may not do. Whatever the ultimate outcome of this litigation, on this question, the agreement is clear and not subject to the interpretation urged by Hearst.

We reverse and remand, with instructions to enter summary judgment on this issue for the Times, declaring that the force majeure clause does not preclude consideration of strike losses for purposes of the escape clause of the JOA.

COLEMAN and AGID, JJ., concur.

Review granted at 152 Wn.2d 1028 (2004).