IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| RUHI SARIYILDIZ, | ) | No. 81663-2-I |
| | ) | |
| Appellant, | ) | DIVISION ONE |
| | ) | |
| v. | ) | |
| | ) | |
| NIHAT KUSKU and FATMA TATLISOZ, | ) | |
| husband and wife, individually and the | ) | |
| marital community composed thereof; | ) | |
| KS CONSTRUCTION, LLC, a | ) | |
| Washington limited liability company; | ) | UNPUBLISHED OPINION |
| SENA CONSTRUCTION, LLC, a | ) | |
| Washington limited liability company; | ) | |
| CLOVERDALE STREET, LLC, a | ) | |
| Washington limited liability company; | ) | |
| and MERGEN INVESTMENTS, LLC, a | ) | |
| Washington limited liability company, | ) | |
| | ) | |
| Respondents. | ) | |

BOWMAN, J. — Ruhi Sariyildiz appeals the trial court's order disbursing funds following dissolution of the construction company he owned with Nihat Kusku. He alleges the trial court erred in its mathematical calculations, leading to incorrect disbursements to the parties. Because the trial court failed to include all sources of income in its calculation of the company's "cash on hand" at the time of trial, we reverse and remand.

Citations and pin cites are based on the Westlaw online version of the cited material.

FACTS

Sariyildiz and Kusku were friends turned business partners.  Sariyildiz had experience in construction and Kusku had money to invest in real estate development as well as a background in accounting.  Together, they started a construction business, KS Construction LLC.  Kusku made an initial capital contribution of $300,000 to the business.  Because Sariyildiz had poor credit and no money to contribute, the parties agreed that half of the initial capital contribution would amount to a loan from Kusku to Sariyildiz to repay later.  As partners, both Sariyildiz and Kusku agreed to split costs and profits evenly and pledged to "contribute each of their 'complete potential' and 'devote their full time for this business.' "  Kusku formed KS as a Washington limited liability company and obtained business and general contractor licenses.  Both the LLC and business license were in Kusku's name because of Sariyildiz's financial situation.

Soon after, Sariyildiz found an uninhabitable duplex property (Duplex) for sale.  Kusku bought the property and titled it in his name only.  Both Sariyildiz and Kusku worked on improvements to the Duplex, with Sariyildiz doing most of the manual labor.  Eventually, KS rented the Duplex to tenants.  While Sariyildiz and Kusku looked for another development opportunity, KS performed construction work for third parties.  Sariyildiz worked the labor for the jobs.  Over time, Sariyildiz and Kusku took draws from KS for living expenses, split evenly between the two of them.

Sariyildiz found three undeveloped residential parcels for sale near the Duplex. The partners agreed to buy the vacant lots and build three new single-family residences (8th Street Project). Kusku bought the properties for KS to develop. To fund construction of the three houses, KS secured a $750,000 loan from "hard money lenders" Alan Ehrlich and Sigrid Broderson (collectively Ehrlich).

When construction on the 8th Street Project was about half complete, Kusku became concerned that KS could not finish the work without more funds. Kusku wanted Sariyildiz to contribute $500,000 to KS in order to complete the 8th Street Project. Kusku knew Sariyildiz could not contribute the money, but he blamed Sariyildiz for "poor management" of the project. He believed Sariyildiz "overstated his qualifications" and was unable to complete the 8th Street Project. Kusku told Sariyildiz to contribute equally to KS or give up his share of the Duplex. Sariyildiz refused to do either. The relationship between Sariyildiz and Kusku deteriorated.

Meanwhile, Kusku's brother-in-law Serif Ali Mergen moved to Seattle. Mergen had loaned Kusku money to purchase the Duplex and the parcels for the 8th Street Project. Kusku and Mergen agreed to finish construction of the 8th Street Project together and exclude Sariyildiz from receiving any profit from the four properties. Mergen and Kusku formed Mergen Investments LLC and Kusku transferred all KS properties to the new company. Kusku also formed Sena Construction LLC. The two new companies executed a joint venture to complete

the 8th Street Project. Mergen and Kusku secured another $500,000 in loans from Ehrlich to fund the work.

Sariyildiz sued Kusku and asserted several claims, including breach of contract, breach of fiduciary duty, and tortious interference with his business interest. Kusku counterclaimed, alleging breach of contract among several other claims. The parties proceeded to bench trial on their competing breach of contract claims.

After trial, the court entered extensive findings of fact and conclusions of law (FFCL). The court concluded Kusku breached the parties' contract and found for Sariyildiz "in an amount to be determined after all the assets belonging to KS are verified and sold." The court found that KS (1) secured $1,250,000.00 in loans from Ehrlich, (2) earned $92,391.00 in rental income from the Duplex with related expenses of $50,586.32, (3) earned $155,000.00 from third-party construction jobs with related expenses of $144,092.26, and (4) paid $192,574.44 in draws for living expenses. The court requested more argument on how best to windup the KS business and reimburse Kusku for his $390,000.00 in capital contributions.[1]

Kusku moved for reconsideration, asking the court to reassess the income and expenses related to the Duplex and 8th Street Project. In an order granting defendants' motion for reconsideration in part and modifying its FFCL, the court adjusted the Duplex income to $131,791.00 and adjusted the costs associated

---

[1] In addition to the original $300,000, Kusku contributed another $90,000 to complete the purchase of the Duplex and the 8th Street Project. Sariyildiz does not dispute that KS should reimburse Kusku for his total $390,000 investment.

4

with the 8th Street Project. The court then calculated the amount of cash that KS had on hand. It concluded:

> The original loan amount, $1,250,000.00, received from . . . Ehrlich . . . had $148,885.46 remaining after deducting . . . construction costs . . . . However, the parties received advances/draws during the partnership totaling an uncontested amount of $192,574.44, with each party receiving half. The remaining $148,885.46 of the Ehrlich . . . loan was used to pay these advances.

The court subtracted the amount of the draws from the remaining loan money and determined that KS had a deficit of $43,688.98. It then concluded that Kusku must have "personally contributed the remaining $43,688.98," making Kusku's total contribution to the company $433,688.98.

The trial court appointed a general receiver to manage the windup of KS because it was "clear that the parties are unable to wind down the LLC or otherwise sell the property amicably." Over the next six months, the receiver sold the Duplex and 8th Street Project properties and repaid the loans to Ehrlich. The receiver paid all outstanding claims and deposited the remaining $550,000.00 into the court registry. Kusku filed a motion requesting disbursement of $441,628.71 for his capital contribution of $433,688.98 plus 12 percent interest on his initial loan to Sariyildiz.

Sariyildiz objected to the amount of disbursement. He argued the court mistakenly determined KS had a deficit of cash at the time of trial because it did not include net rental income from the Duplex or third-party construction work as assets in its calculations. He showed that had the court included that income, KS would have had a surplus of cash on hand rather than a deficit of $43,688.98. Sariyildiz argued that as a result of the mistake, the court credited Kusku with

5

contributing money to cover a deficit that did not exist, and that Kusku should be entitled to only his $390,000.00 contribution. The trial court disagreed, granting the motion to disburse and releasing $441,628.71 to Kusku.

Sariyildiz moved to reconsider, arguing again that the court erroneously determined Kusku's contribution by crediting him $43,688.98 to cover a "cash shortfall" that did not exist. The court found this to be "an attempt to relitigate findings of fact from a year ago or to reconsider the findings of fact from a year ago." The court concluded the motion was untimely and denied reconsideration.[2]

The parties then filed competing requests for final distribution of the funds, attorney fees, and costs. The court found that $150,313.16 remained in the court registry to be disbursed. Because Sariyildiz's motion for reconsideration delayed repayment of the entire amount of the original loan to Kusku, the trial court determined that Kusku was entitled to additional interest accrued on his loan to Sariyildiz. The court also concluded that Sariyildiz's motion for reconsideration was not "substantially justified" and awarded $1,476.00 in attorney fees and costs to Kusku. The trial court then disbursed $74,788.11 to Sariyildiz and $75,525.05 to Kusku.

Sariyildiz appeals.

ANALYSIS

We review a court's order disbursing funds for abuse of discretion. Wilson v. Henkle, 45 Wn. App. 162, 166, 169, 724 P.2d 1069 (1986). "A trial court abuses its discretion when its decision is manifestly unreasonable or based upon

_____

[2] The court also found that Sariyildiz did not follow the correct procedure for noting the motion to shorten time to consider his reconsideration motion.

untenable grounds or untenable reasons." Go2Net, Inc. v. C I Host, Inc., 115 Wn. App. 73, 88, 60 P.3d 1245 (2003).

Calculation of Cash on Hand

Sariyildiz argues the trial court erred by refusing to consider his objection to the order of disbursement and motion to reconsider. He asserts the court's failure to include rental and third-party work income when calculating KS' cash on hand at the time of trial led to overcompensating Kusku. Kusku claims the "disbursement court properly concluded that Sariyildiz could not collaterally attack a final judgment entered a year prior to the order of disbursement." We agree with Sariyildiz.

A. Finality of Amended Findings

Kusku claims Sariyildiz's objection to the court's order of disbursement was "a collateral attack on an unappealed-from final decision entered a year before the disbursement proceedings." According to Kusku, Sariyildiz "had 30 days from entry of the [amended FFCL] to appeal" because the FFCL are "an appealable decision" under RAP 2.2(a)(3). We disagree.

A party must file a notice of appeal within "30 days after the entry of the decision of the trial court." RAP 5.2(a). Under RAP 2.2(a)(3), a decision is appealable if it affects "a substantial right in a civil case that in effect determines the action and prevents a final judgment or discontinues the action." Kusku offers no argument as to how the court's amended FFCL prevented final judgment or discontinued Sariyildiz's and Kusku's lawsuits. Indeed, the court continued to hear argument from the parties and resolve disputes about KS

assets and liabilities until it issued its order of disbursement almost a year after entering its amended FFCL.  The court's amended FFCL did not trigger the 30-day timeline for Sariyildiz to appeal under RAP 2.2(a)(3).

Even so, Kusku cites State v. Scheel, 74 Wn.2d 137, 140, 443 P.2d 658 (1968), to argue, "Our Supreme Court has long held that an appeal from an order disbursing funds from the court registry does not permit a collateral attack on the underlying judgment."  But Scheel pertains to the collateral attack of a final judgment entered after trial.  Scheel, 74 Wn.2d at 138-39.  Here, the trial court entered amended FFCL but did not reduce the findings to a final judgment.[3]

B.  Collateral Estoppel

Kusku next claims that Sariyildiz was "precluded by collateral estoppel principles from relitigating the issue of Kusku's capital contribution."  According to Kusku, "[i]f no appeal is taken from a judgment entered by a court with subject matter and personal jurisdiction, the judgment becomes subject to both res judicata and collateral estoppel principles."[4]

Both res judicata and collateral estoppel "prevent relitigation of that which has previously been litigated."  Luisi Truck Lines, Inc. v. Wash. Utils. & Transp. Comm'n, 72 Wn.2d 887, 894, 435 P.2d 654 (1967).  Res judicata prevents relitigation of a cause of action.  Luisi, 72 Wn.2d at 894.  Collateral estoppel precludes relitigation of issues.  Christensen, 152 Wn.2d at 307.  A party

---

[3] We also note that Sariyildiz does not challenge the trial court's substantive findings on the value of KS assets.  Rather, he points to a mathematical error in the court's calculation of the sum of those assets.  A mathematical error is clerical in nature.  See In re Marriage of King, 66 Wn. App. 134, 138, 831 P.2d 1094 (1992).  Under CR 60(a), the trial court could have corrected the clerical error "at any time."

[4] Citing Anderson v. Anderson, 52 Wn.2d 757, 328 P.2d 888 (1958); Christensen v. Grant County Hosp. Dist. No. 1, 152 Wn.2d 299, 306, 96 P.3d 957 (2004).

asserting either collateral estoppel or res judicata must show the earlier proceeding ended in a judgment on the merits. Christensen, 152 Wn.2d at 307; Hanson v. City of Snohomish, 121 Wn.2d 552, 561-62, 852 P.2d 295 (1993).

Here, the trial court's amended FFCL did not amount to a final judgment on the merits. Neither collateral estoppel nor res judicata barred Sariyildiz from challenging the trial court's calculations at disbursement.

### C. Error in Calculation of Assets

Sariyildiz argues that the court's calculation of cash on hand was not accurate because it "fails to account for the net profits that KS received from the Duplex and the third-party jobs." Sariyildiz is correct.

The trial court found the Duplex generated $81,204.68 in net income.[5] The third-party work brought in a net profit of $10,907.74.[6] As a result, KS earned $92,112.42 in net profit that the court did not include in its calculation of KS' cash on hand. This is a clerical mistake that must be corrected because it impacts the downstream division of money between the parties. The correct calculation leads to a surplus of cash on hand at the time of trial rather than a deficit of $43,688.98 that the court credited to Kusku. Without the shortfall, no evidence supports Kusku's additional capital investment beyond the undisputed $390,000.00 that he used to purchase the four properties.[7]

---

[5] $131,791.00 in rental income minus $50,586.32 in expenses.

[6] $155,000.00 in income minus $144,092.26 in expenses.

[7] Sariyildiz raises additional assignments of error related to the trial court's calculations for disbursement. Because the trial court must recalculate the assets of KS on remand, we do not address these issues. Sariyildiz also claims the trial court "abused its discretion when it denied Sariyildiz any consideration for Kusku's unauthorized disposal" of a truck belonging to KS. Sariyildiz makes no legal argument in support of his claim and we cannot conclude the trial court's decision was an abuse of discretion. RAP 10.3(a)(6).

Attorney Fees

The trial court awarded Kusku attorney fees for responding to Sariyildiz's opposition to its order disbursing funds because the opposition was not "substantially justified." Because we disagree that Sariyildiz improperly sought to relitigate the FFCL, we reverse that award. We also decline Kusku's request for attorney fees on appeal.[8]

We reverse the order of disbursement and remand to the trial court to include the net income from the Duplex and third-party construction work in calculating KS' cash on hand at the time of trial and to vacate the award of attorney fees to Kusku.

Bruner, J

WE CONCUR:

Coburn, J.                    Dwyer, J.

---

[8] Kusku requests fees under RAP 18.9(a), which allows an appellate court to award fees as a sanction for a frivolous appeal. An appeal is frivolous if it presents no debatable issues and is devoid of merit. Cox v. Kroger Co., 2 Wn. App. 2d 395, 410, 409 P.3d 1191 (2018).