IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

In the Matter of the Dependency of:

C.J.S. (DOB: 04/25/2016),

                Minor child,

CHRISTINA BARRON,

                Appellant,

          v.

STATE OF WASHINGTON,
DEPARTMENT OF SOCIAL AND
HEALTH SERVICES,

                Respondent.

DIVISION ONE

No. 78521-4-I

UNPUBLISHED OPINION

FILED: April 29, 2019

ANDRUS, J. — Appellant Christina Barron[1] appeals the order terminating her parental rights to C.J.S.[2] She contends that the Department of Social and Health Services (Department) failed to prove that it notified her of her alleged parental deficiencies, that it offered all necessary services, that her deficiencies cannot be remedied in the near future, and that she is currently unfit to parent C.J.S. She further contends that she received ineffective assistance of counsel. We disagree and affirm.

---

[1] For clarity, we refer to the mother by her first name. We mean no disrespect.
[2] To protect the privacy interests of the minor children, we use their initials throughout this opinion. General Order for the Court of Appeals, In re Changes to Case Title, (Aug. 22, 2018), effective Sept. 1, 2018.

FACTS

In May 2013, the Department of Social and Health Services filed dependency petitions relating to Christina's children, A.L., then age 4, and D.L., then age 2. The Department alleged the children suffered from medical neglect, poor hygiene, and unexplained injuries. In addition, the Department alleged Christina had a history of domestic violence and had a 2013 assault conviction against the children's father.

Christina agreed to orders of dependency for A.L. and D.L. in December 2013. She also agreed to participate in parenting classes, to undergo domestic violence and mental health assessments, and to obtain safe and stable housing. She subsequently agreed to undergo a psychological evaluation, and to participate in individual counseling. Her visitation with A.L. and D.L. was initially supervised once a week for two hours a visit.

Over the course of the next 15 months, Christina engaged in services and increased her contact with the children. By February 2015, the trial court noted that although the children had been out of Christina's care for 15 of the last 22 months, good cause existed to refrain from filing a termination petition because she was making progress on correcting her parental deficiencies and the Department hoped to transition the children home within the next three months. The trial court also found Christina was visiting the children regularly and gave her unsupervised visits once a week.

But during the summer of 2015, Christina began a relationship with C.S. In October 2015, the Department moved to modify Christina's visitation from unsupervised to supervised, because she had permitted C.S. to participate in visits

with her children, despite the lack of Department approval. The trial court granted the motion and required her visits with A.L. and D.L. to be monitored based on her lack of compliance with visitation requirements.

The Department subsequently discovered that C.S. was physically and emotionally abusing Christina, and that he had hit her with a bat in front of A.L. and D.L. When the Department learned Christina was pregnant with C.S.'s child, it tried to safety plan with Christina because the social workers were concerned with her safety and the safety of her unborn child. Christina did not cooperate with the Department's efforts. The Department suggested that Christina move in with a relative so that her baby could be placed with her, but she refused because the relative would not allow C.S. on her property.

At a January 2016 dependency review hearing, the trial court ordered the Department to file a termination petition on behalf of A.L. and D.L. The court found that while Christina had completed mental health counseling and domestic violence treatment, she was only making partial progress toward correcting the problems that necessitated the children's placement in out-of-home care. The Department filed termination petitions on behalf of A.L. and D.L. in June 2016, and Christina agreed to relinquish her parental rights to them in September 2016.

Christina gave birth to C.J.S. on April 25, 2016. C.J.S.'s father is C.S.[3] The Department filed a dependency petition for C.J.S. two days after his birth and the trial court placed him with a paternal aunt.

---

[3] The parental rights of C.J.S.'s father, C.S., are not at issue in this appeal. The trial court terminated his parental rights on August 28, 2017.

In May 2016, the Department referred Christina to a program called Incredible Years, a program to help her learn to "prioritize child safety and well-being," and "to learn her infant's cues and follow through on meeting the infant's basic, medical, and care/supervision needs." The following month, the Department provided Christina with referrals to a mental health assessment and counseling and a domestic violence victims' education class.

In August 2016, Christina agreed to an order of dependency for C.J.S., and agreed to participate in domestic violence victim education and parenting classes, and to undergo a second mental health assessment. Christina was initially allowed three unsupervised visits with C.J.S. per week for two hours per visit. She was prohibited by court order from permitting C.S. to participate in any visits.

In September 2016, the Department referred Christina for individual counseling. It identified the issues on which Christina needed help:

> The client's parental rights of her two older sons (ages 5 and 7) were terminated in the middle of September. This case has been open since 5/7/2013. The client has been engaging in all of her court ordered services, however minimal progress has been made throughout the life of the case. Additionally the client gave birth to another baby boy on 4/25/2016. The dependency case on the infant remains open at this time. The department is requesting that the client receive counseling regarding the loss of her two older sons in order to ensure that her mental health is stable enough to care for an infant.

The Department identified the goals for counseling as three-fold:

> (1) To develop insight into the neglect and abuse her two older sons experienced while in her care and how that is correlated with the loss of her parental rights.
> (2) To develop appropriate boundaries with the people whom she communicates (personal relationships and professional relationships) including insight into romantic relationships w/unsafe men.
> (3) To develop a prosocial support network.

Around that same time, Christina ended her relationship with C.S. Department social workers "started to see the progress. She was more willing to communicate with [her social worker] in an open manner, more forthcoming and honest in her communications with [her social worker]." In October 2016, the trial court found Christina was visiting C.J.S. regularly, and she was in compliance with the dependency court order. Without safety concerns related to C.S., the Department allowed Christina to have unsupervised community visits with C.J.S.

When Christina left C.S., she lost her housing. The Department worked with her through the fall of 2016 to help connect her with housing resources. In early 2017, Christina moved into a hotel room with a new boyfriend, C.M. Christina was aware that C.M. had a 14-year-old domestic violence conviction, and had prior CPS history with his own child. Christina also knew that this history would create problems for her with the Department.

Nevertheless, Christina asked the Department to allow C.M. to have unsupervised contact with C.J.S. The Department started a background check on C.M. at that time. In March, 2017, the Department notified Christina that C.M. had not passed the background check because of prior CPS findings of neglect and a fourth degree assault conviction.

Department social workers asked Christina to clarify if she wanted to move toward reunification with C.J.S. alone or if she wanted C.M. to be a part of this reunification plan. If she chose the latter option, the Department informed her it needed to assess him for services.

The Department never completed an assessment of C.M. In March 2017, the Department asked Christina for a copy of C.M.'s criminal background history documentation ("rap sheet"). Christina provided the rap sheet in April 2017, but the social worker mistakenly believed Christina had not sent it to her. The Department asked Christina to provide C.M.'s rap sheet at least three more times. Christina consistently told the Department that she had already provided it to her social worker. It was not until the second day of trial that a Department social worker realized she had a copy of the rap sheet in the file and apparently had had it for nearly a year. But Christina also had a copy of the rap sheet and refused to provide it again when the Department repeatedly asked her to do so.

At the same time, various Department social workers asked to meet with C.M. to assess him for services he might need to safely participate in C.J.S.'s care. He met with a Department social worker briefly in March 2017 to complete the background check paperwork. After that, the Department attempted to contact C.M. or asked Christina to set up a meeting with him at least three times. He did not follow through and the Department was never able to assess C.M. for contact with C.J.S.

Meanwhile, at the April 19, 2017, permanency planning hearing, the court found Christina in compliance and making partial progress toward eliminating her parental deficiencies. Because Christina was visiting C.J.S. regularly, the trial court, at the Department's recommendation, allowed her to have two seven-hour unsupervised visits per week. However, because of the duration of the case, the trial court found that returning C.J.S. home to Christina was no longer an

appropriate permanent plan, and changed the primary permanency plan for C.J.S. to adoption, with return home to mother as the alternative plan.

The Department renewed Christina's individual counseling referral. It noted that Christina's counselor, Kristin Roessler, reported:

> . . . she and the client are just over halfway through their work. Ms. Roessler reports that they have been working on boundaries, communication, honesty and making healthy choices. They have also been working on "who you're choosing, how you're making those decisions, [and] does it fit with future goals." Ms. Roessler reports these are the same things they have worked on prior, a couple years ago when client was in counseling during the dependency of her two older children. Ms. Roessler reports that mother has made progress insofar as she is "definitely more aware than she used to be" however Ms. Roessler states that they have more work to do in turning said awareness into action through life choices.

On June 23, 2017, the Department filed a petition to terminate Christina's parental rights. The Department alleged the parental deficiencies of "mental health issues, lack of parenting skills, domestic violence, and lack of safe and stable housing." The Department alleged that Christina failed to complete the Project Aware classes, and had not reengaged in this service, was not making progress in counseling sessions, and "she chose an unsafe person to live with."

At the September 27, 2017, dependency review hearing, the court found Christina in partial compliance but making no progress in eliminating her parental deficiencies. It found Christina had one domestic violence class to complete "but ha[d] disengaged."[4] It also found Christina had stopped attending counseling

---

[4] After the court made this finding, Christina completed the Project Aware classes in November 2017.

sessions with Ms. Roessler, had not yet found safe and stable housing, and was no longer visiting C.J.S. on a regular basis.

Christina's termination trial occurred in March 2018. The focus of the trial was Christina's inability to parent C.J.S., manifested through her infrequent visits with her son, her failure to participate in his medical and dental appointments, and her prioritizing her relationship with C.M. over the needs of her child.

Visits. At trial, the trial court found that before July 2017, C.J.S.'s caregiver initiated visits, and under those circumstances, Christina visited four to eight times each month. But when the caregiver stopped prompting, Christina's visits decreased. Christina visited C.J.S. only once in September 2017. Over the fall of 2017 and winter and spring of 2018, her visits remained sporadic. She visited C.J.S. only four times in October, once in November and December, three times in January 2018, and once in February. Her visits became more regular only in the weeks before the March 2018 termination trial.

Christina testified she lived in Tulalip and C.J.S. lived in Monroe, making it difficult for her to make trips to see her son. But the Department provided bus passes or an ORCA bus card for Christina to use to travel for the visits. Sometimes, Christina drove herself to visits in C.M.'s car. Christina saw C.J.S. only once in September 2017 because she did not want to interact with his relative placement who was then transporting the child to and from visits.

Even though Christina had graduated to unsupervised visits with C.J.S., Christina twice requested that the visits revert to supervised visits with Department-provided transportation. Her purpose was for C.M. to attend the visits and she also wanted to avoid C.J.S.'s caregiver. When Christina first made the

8

request, the Department sought a transporter but found no one willing to pick up the contract. When Christina later requested a visit supervisor, the Department denied the request because Christina's visits were too inconsistent and supervised visits too restrictive.

Christina also worked throughout the dependency, sometimes more than one job, and cited her work schedule as a barrier to consistent visitation with C.J.S. But the Department presented evidence that Christina's explanations for not visiting C.J.S. were not credible. In October and November 2017, Christina was only working part-time between 8 and 20 hours a week. Once she started working for Wal-Mart around Thanksgiving 2017, she began working 25 hours a week. Her work hours thereafter averaged between 30 and 40 a week.

Christina testified she missed visits in November 2017 because a car accident impacted her transportation, but she had the monthly bus pass, did not tell her social worker that the accident was a barrier to visitation until weeks after the accident, and she missed no work as a result of the accident. And she admitted she made no attempt to visit C.J.S. on Christmas, despite having the day off of work.

The Court Appointed Special Advocate (CASA) expressed her concern with Christina's lack of visitation, explaining that "[t]he number of visits that she could have set up, followed through with and attended, I can barely count them on my fingers. When you look at the number of hours she could have spent with this child, it's minimal at best." Department social workers echoed this concern. One social worker, when discussing Christina's deficits, testified that Christina's current unfitness to parent was based in large part on her failure to spend meaningful time

with C.J.S. "[H]er lack of visitation was a big part of it . . . [T]hat's time that's used to gain parenting skills and create that bond." The CASA described Christina as more of a "playmate" to the child than a parent.

Medical and Dental Appointments. Christina attended only one of four medical appointments for C.J.S. in the fall of 2017. She did not attend either of his two scheduled dental appointments. C.J.S.'s social worker notified Christina of these appointments but Christina did not show up, either claiming she had to work or admitting that she had forgotten about them.

Prioritizing Relationship with C.M. over C.J.S. The Department first learned Christina was living with C.M. in January or February 2017. Initially, Christina described him as a "roommate," and the Department did not understand whether he was an intimate partner. The Department learned of this fact for the first time from C.J.S.'s caregiver. When her social worker confronted Christina with this fact, she denied having a romantic relationship with C.M. It was C.M. who disclosed the relationship on his background check form in March 2017. Yet, Christina testified at trial that she and C.M. were not a couple until May 2017. Christina's counsel represented that the relationship had begun in February 2017.

The Department social worker testified that she met with Christina in October 2017 and clearly explained to her what she needed to do to achieve reunification with C.J.S., including having C.M. contact her to be assessed. C.M. failed to do so.

At trial, Christina testified she had understood for six months that her relationship with C.M. was a barrier to her reunification with C.J.S. Christina testified that although the social worker asked to meet C.M., she and C.M. did not

10

have the time to do so. C.M. admitted Christina asked him to call the social worker but that she did not explain why. He acknowledged he never reached out. When Christina was asked why she did not make sure C.M. met with the Department, her response was simply "I don't control others."

In January 2018, Christina asked her social worker if she should move into a shelter to have C.J.S. placed with her. The social worker confirmed that C.J.S. could be placed with her if she were living in a shelter, but Christina did not take this step.

Christina testified at trial that although she wanted to be a family with C.M. and C.J.S., she would have asked C.M. to move out or break off the relationship if the Department had just asked her to do so. C.M. similarly testified he would be willing to do services if the Department asked him, despite failing to contact the Department for almost a year after being asked to do so. C.M. also testified he would have moved out of his home with Christina.

At trial, there was disputed testimony regarding C.M.'s history of substance abuse and potential current use of marijuana and alcohol. C.M. testified that after CPS was involved in his family, he underwent inpatient drug and alcohol treatment, followed by intensive outpatient treatment. On cross examination, he admitted marijuana was his drug of choice and that he had been diagnosed with alcohol dependence. He admitted he still used marijuana and drank alcohol, although he denied using alcohol with Christina. Christina, however, testified she had a drink with C.M. on only one occasion and denied C.M. ever used drugs or drank alcohol. The CASA, who met with C.M., testified she could smell marijuana in the trailer.

The Department was never able to assess C.M.'s substance use or fitness to parent C.J.S. because he refused to meet with Department social workers.

After the three-day termination hearing, the trial court terminated Christina's parental rights as to C.J.S. The trial court entered over 200 findings of fact. But the key findings are:

- C.J.S. had been found to be a dependent child,

- the court had entered a dispositional order,

- C.J.S. had been removed from Christina's custody for at least six months,

- services ordered under RCW 13.34.136 have been expressly and understandably offered or provided, and all necessary services reasonably available, capable of correcting Christina's parental deficiencies within the foreseeable future, were expressly and understandably offered to her,

- Christina's parenting deficiencies are in the area of neglect by not prioritizing the child over new relationships, subjecting her children to unapproved and/or unsafe people and witnessing domestic violence, and not attending to the child's medical, social or psychological needs and her lack of consistent visitation,

- there is little likelihood that conditions will be remedied so that C.J.S. can be returned to Christina in the near future and that the mother is currently unfit to parent,
- continuation of the parent-child relationship clearly diminishes C.J.S.'s prospect for early integration into a stable and permanent home, and

- termination of Christina's parental rights was in the best interest of the child.

ANALYSIS

A. Standard of Review

Parental rights are a fundamental liberty interest protected by the United States Constitution. See Santosky v. Kramer, 455 U.S. 745, 753, 102 S. Ct. 1388,

12

71 L.Ed.2d 599 (1982). However, "the State has an equally compelling interest in protecting the physical, mental and emotional health of the children." In re Dependency of H.W., 70 Wn. App. 552, 555, 854 P.2d 1100 (1993) (citing In re Sego, 82 Wn.2d 736, 738, 513 P.2d 831 (1973)). In order to terminate the parent-child relationship, the Department must first prove six statutory elements by clear, cogent, and convincing evidence:

> (a) That the child has been found to be a dependent child;
>
> (b) That the court has entered a dispositional order pursuant to RCW 13.34.130;
>
> (c) That the child has been removed or will, at the time of the hearing, have been removed from the custody of the parent for a period of at least six months pursuant to a finding of dependency;
>
> (d) That the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided;
>
> (e) That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future . . . and
>
> (f) That continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home.

RCW 13.34.180(1). Next, due process requires the trial court to expressly or impliedly find by clear, cogent, and convincing evidence that the parent is currently unfit. In re Welfare of A.B., 168 Wn.2d 908, 918-19, 232 P.3d 1104 (2010). If all of these elements are proven, the trial court must also find by a preponderance of the evidence that termination is in the "best interests" of the child. RCW 13.34.190(1).

On review, we ask only whether the court's findings of fact are supported by substantial evidence and whether those findings support the court's conclusions of law. In re Dependency of P.D., 58 Wn. App. 18, 25, 792 P.2d 159 (1990). "Substantial evidence exists if the record contains evidence of sufficient quantity to persuade a fair-minded, rational person of the truth of the declared premise." Bering v. Share, 106 Wn.2d 212, 220, 721 P.2d 918 (1986) (citing In re Snyder, 85 Wn.2d 182, 185-86, 532 P.2d 278(1975)). "If there is substantial evidence which the lower court could reasonably have found to be clear, cogent and convincing, an appellate court should not disturb the trial court's findings." In re Welfare of Aschauer, 93 Wn.2d 689, 695, 611 P.2d 1245 (1980).

B.    Notice of Parental Deficiencies

Christina contends that her due process rights were violated because she received inadequate notice of her parental deficiencies. She argues that the dependency and termination petitions did not allege that her parental rights could be terminated due to C.M.'s substance use or her inconsistent visitation with C.J.S.

Parental rights cannot be abridged without due process of law. In re Dependency of A.M.M., 182 Wn. App. 776, 790-91, 332 P.3d 500 (2014). In particular, due process requires "'that parents receive notice of the specific issues to be considered'" at a termination hearing. Id. at 791 (quoting In re Welfare of Martin, 3 Wn. App. 405, 410, 476 P.2d 134 (1970)). Such notice is necessary "'to prevent surprise, helplessness and disadvantage.'" Id. (quoting Martin, 3 Wn. App. at 410). We look to the entire dependency and termination record when determining the adequacy of the notice. In re the Parental Rights of F.M.O., 194 Wn. App. 226, 232, 374 P.3d 273 (2016).

14

The trial court found that "[t]he mother's failure to consistently visit her child and her failure to attend medical appointments is ongoing evidence of the parental deficiency of neglect and failing to attend to the emotional and medical needs of her child." The record shows that Christina had notice of these parental deficiencies.

First, throughout the dependency with A.L. and D.L., Christina was aware that the court was monitoring the consistency and duration of her visits with her children. In C.J.S.'s case, Christina was also aware the trial court was deciding whether she was visiting him regularly and meeting her visitation schedule and conditions. She also knew that in a September 2017 dependency review hearing, the court found that she was not visiting C.J.S. regularly and that, as a result, she was not making any progress toward remedying her parental deficiencies.

Second, Christina had been participating in individual therapy for several years and one of the specific issues the Department asked her counselor to address was Christina's "need[] to learn her infant's cues and follow through on meeting the infants [sic] basic, medical, and care/supervision needs." Christina's counselor, Kristin Roessler, testified that she discussed with Christina how her lack of contact with C.J.S. would affect him. Christina acknowledged to Roessler that she knew her lack of contact needed to improve.

Third, Christina knew the Department had removed A.L. and D.L. from her care because of neglect. She also knew the trial court had removed C.J.S. from her care because it had determined she was incapable of adequately caring for him, placing him in danger of damage to his psychological or physical development. She had notice over the course of C.J.S.'s dependency that her

15

parental deficiencies included a lack of parenting skills and lack of attention to her children's needs.

Christina next argues that she did not have notice that C.M.'s substance use could be a basis for termination. The trial court found:

> 2.147 Given [C.M.'s] and the mother's history of neglecting their prior children, [C.M.'s] use of marijuana and alcohol is concerning because one of the mother's primary parental deficiencies is the neglect of [C.J.S.] and another is choosing unsafe partners and allowing them to be around her children.

Christina argues that before trial, the Department's concern about C.M. centered on his CPS and domestic violence history, not his substance use. This may be true, but it would have been difficult for the Department to notify Christina, before trial, that C.M.'s drug or alcohol use was a concern when C.M. refused to voluntarily meet with or be assessed by the Department. C.M. revealed the nature of his past substance abuse while testifying at trial. And it is a misstatement to contend that C.M.'s drug use was the basis for termination. The finding makes it clear that the primary parental deficiencies were her neglect of her child and her choosing unsafe partners, not C.M.'s drug use.

Christina was on notice that exposing her children to unsafe partners was a basis for termination. The termination petition alleged there was little likelihood that Christina could remedy her parental deficiencies in the near future because she "chose an unsafe person to live with." The person she was living with at the time was C.M. Christina was aware that her relationship with C.M. was a barrier to reunification. She thus was on notice that the Department had concerns about C.J.S.'s safety if C.M. were in Christina's home. C.M.'s history of substance abuse, which was revealed by C.M. for the first time at trial, is merely evidence that

16

Christina was unwilling to acknowledge C.M. may have presented a safety risk to C.J.S.

Christina had sufficient notice from the overall record to correct and defend against her lack of visitation and attendance at medical appointments and to correct and defend against her choice of unsafe partners. Her due process rights were not violated.

C.    Failure to Offer Services

Christina argues the Department failed to offer her services to improve the consistency of her visitation with C.J.S. The record does not support this argument.

In order to terminate parental rights, the Department must prove that it offered "all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future." RCW 13.34.180(1)(d). Necessary services are those services "'needed to address a condition that precludes reunification of the parent and child.'" In re Parental Rights of K.M.M., 186 Wn.2d 466, 480, 379 P.3d 75 (2016) (quoting A.M.M., 182 Wn. App. at 793).

The trial court found that the Department offered Christina all necessary services. From this finding, we infer the trial court found transportation-related services were not necessary. Substantial evidence supports this finding.

Christina contends that she would have visited more regularly if the Department had arranged transportation for her, because she lived so far away, wanted to avoid contact with C.J.S.'s caregiver, and had a busy work schedule. But the trial court did not find credible Christina's testimony that she was unable to visit C.J.S. because of the travel distance or work schedule. The trial court found

Christina had been able to visit regularly for several months, despite living in various locations. Christina chose to move to Tulalip, despite the fact that C.J.S. lived in Monroe. In fact, Christina did not look for a home or a job near her child in Monroe, despite having no particular ties to Tulalip or Marysville. The trial court could see no "reason for her failure to visit for over a month at a time."

The trial court also rejected Christina's suggestion that her work schedule interfered with consistent visits. Her work schedule did not explain why she did not visit at all in October until October 18, 2017, when she then scheduled four visits relatively close together. And up until Thanksgiving, her work schedule in November 2017 was only 8 to 20 hours per week, yet Christina only visited C.J.S. on November 1, and not again until December 6, 2017. It also found not credible Christina's testimony that she rarely had a day off, finding "[t]he mother should have been arranging to have at least one day off, as she had done previously so she could visit at least one day a week." These findings support a conclusion that Christina chose not to visit C.J.S. and that the lack of transportation was simply a convenient excuse, not a true barrier.

Moreover, when Christina initially asked to revert from unsupervised to supervised visits so she could obtain Department-provided transportation, the Department requested a visit transporter and no one picked up the contract. In September 2017, the Department rejected Christina's second request in part because her visits had been so inconsistent and because it would result in more restrictive visitation. The trial court found the Department made it clear to Christina that she needed to have a consistent visit schedule for a transporter to be willing

to accept the job. Although Christina stated she would have a more consistent schedule, she did not respond with more consistent visits.

These findings and credibility determinations support the ultimate finding that the Department offered necessary services, reasonably available, and capable of improving Christina's parental deficiencies.

D.  Near Future

Christina argues that the Department failed to prove that there was little likelihood that her parental deficiencies could be remedied in the near future. We disagree.

The focus of RCW 13.34.180(1)(e) is "whether parental deficiencies have been corrected." In re Dependency of K.R., 128 Wn.2d 129, 144, 904 P.2d 1132 (1995). "A determination of what constitutes the near future depends on the age of the child and the circumstances of the placement." In re Dependency of T.L.G., 126 Wn. App. 181, 204, 108 P.3d 156 (2005) (citing In re Dependency of T.R., 108 Wn. App. 149, 165–66, 29 P.3d 1275 (2001)).

A parent is not entitled to an unlimited time to become a fit parent, and theoretical possibilities of improvement in the near future are not enough. In re Welfare of C.B., 134 Wn. App. 942, 958, 143 P.3d 846 (2006) (quoting T.R., 108 Wn. App. at 166)). "When it is eventually possible but not imminent, for a parent to be reunited with a child, the child's present need for stability and permanence is more important and can justify termination." Id. at 958-59 (citing T.R., 108 Wn. App. at 166).

The trial court found that C.J.S.'s near future is two to four months. It also found:

19

2.191 [T]he court considered setting the case out six to eight weeks to see what progress could be made as far as consistent visitation, and the mother showing more responsibility for [C.J.S.'s] needs.

2.192 However, even if the Court were to accept the testimony that Mother is willing to have [C.M.] move out, the court cannot see a trial return home for at least three months. The mother would need to first show that she can attend all of her allowed visits and attend medical appointments. She would then need to increase visitation to overnights and come up with a viable plan for the care of [C.J.S.] while she is working. She would also need to show the ability to schedule and attend necessary medical and dental appointments. After a return home, given the mother's history, there would need to be a several-month period of close monitoring.

2.193 Thus, it would take at least 6 months for the mother to demonstrate she is currently fit to parent. At this time, she is currently unfit.

. . .

2.195 Given the age of the child and the length of this dependency, six months is beyond the foreseeable future for this child. [C.J.S's] near future is two to four months.

2.196 Thus, the Court finds by clear cogent and convincing evidence that there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future.

Substantial evidence supports these findings. First, C.J.S. was removed from Christina's care at birth. By the time of trial, he had been out of her care for almost two years. He had never resided with Christina or even spent an overnight with her.

Second, Christina was aware that a lack of contact was harmful to her relationship with her child and was resulting in a lack of a bond with him. She knew she needed to begin overnight visits with C.J.S. to make progress. But instead of finding ways to increase her contact with C.J.S., it decreased between July 2017 and March 2018.

20

As one social worker explained, "seeing a child once a month is very different from being responsible for that child 24/7, and the mother had every opportunity to see her child more consistently to develop a stronger bond with him and to demonstrate safe parenting over more sustained periods of time." Another social worker explained "if a parent was having weekly visitation, they could show a lot more skills, parenting skills." Because C.J.S. had been dependent since birth, Christina had two years to not only complete ordered services, but to improve her parenting deficiencies. She accomplished the former but not the latter.

Third, Christina never demonstrated an ability or willingness to actually parent C.J.S. The trial court found Christina does not have a viable plan for raising this child or providing for his care. She had not determined who might provide childcare while she was at work. She had not assumed the responsibility of actually scheduling C.J.S.'s medical or dental appointments or followed through with C.M.'s background check. In sum, she had not shown the ability to proactively parent this child.

Christina argues that her parental deficiencies could be remedied in two to four months based on the court's finding that "even if the Court were to accept the testimony that Mother is willing to have [C.M.] move out, the court cannot see a trial return home for at least three months." Christina is taking this finding out of context.

First, the trial court explicitly rejected Christina's testimony that she ever intended to move to a shelter or have C.M. move out of their trailer:

> 2.194 Considering the mother's history of allowing unapproved individuals around her children, and the fact that the mother did not move to a shelter prior to trial or have [C.M.] move out of the trailer

21

prior to trial, the Court finds that [C.M.] would continue to be a part of the mother's life even if he moved out and that the mother would ultimately allow [C.M.] to be around [C.J.S.] whether [C.M.] had been approved or not.

Second, the trial court framed its finding in the subjunctive mood, expressing its skepticism that Christina would complete all the necessary steps for such a trial return home. The trial court found Christina had not, in the prior two years, demonstrated any ability to meet any of these expectations. Thus, the trial court's doubts about a potential return home actually support its ultimate finding that there was little likelihood Christina could or would remedy her parental deficiencies within the near future.

Christina argues that her lack of progress during the dependencies of A.L. and D.L. should not be basis for termination, and that she made progress during and after C.J.S.'s dependency. There is nothing inappropriate in considering Christina's parenting history, including prior dependencies, to determine whether it was likely that she would remedy her parental deficiencies in the near future. While Christina made progress in therapy and engaged in services during C.J.S.'s dependency, the trial court found the services did not ameliorate her underlying parental deficiencies.

Finally, Christina asks that we consider evidence she provided to the trial court with her motion for reconsideration in which she stated she had been able to consistently visit C.J.S. after trial. Christina's motion for reconsideration is governed by CR 59(a). The decision to grant or deny a motion for reconsideration after trial is within the discretion of the trial court and will not be reversed absent an abuse of discretion. Rivers v. Wash. State Conf. of Mason Contractors, 145

22

Wn.2d 674, 684-85, 41 P.3d 1175 (2002). A trial court may consider newly discovered evidence after trial under CR 59(a)(4) only if it would probably change the result of the trial, was discovered since the trial and could not have been discovered before trial by an exercise of due diligence, is material and is not merely cumulative or impeaching. Go2Net, Inc. v. CI Host, Inc., 115 Wn. App. 73, 88, 60 P.3d 1245 (2003) (citing Holaday v. Merceri, 49 Wn. App. 321, 329, 742 P.2d 127 (1987)).

The trial court considered Christina's evidence and concluded it would not alter the trial court's findings. It concluded that "the 'newly discovered evidence' does not address all of the court's concerns." It also concluded that "visiting her child regularly and attending medical and dental appointments are not things that anyone should have to tell a parent to do. Those things are essential to the care and physical and emotional well-being of a child. A parent cannot cure this deficiency with a short burst of regular visitation and attending a couple of appointments." We find no abuse of discretion in the trial court's decision to deny the motion for reconsideration and this court will not consider evidence not admitted at trial.

E.     Currently Unfit

Christina argues that the State failed to prove that she was currently unfit to parent C.J.S. We reject this argument as well.

In addition to meeting the statutory prerequisites of RCW 13.34.180(1), the State must show current parental unfitness by clear, cogent, and convincing evidence. In re Welfare of A.B., 181 Wn. App. 45, 61, 323 P.3d 1062 (2014). To meet this burden, the State must prove that the parenting deficiencies prevent the

parent from providing the child with "'basic nurture, health, or safety.'" Id. (quoting RCW 13.34.020). Recognized parental obligations include expressing love and affection to one's children; expressing personal concern over their health, education and welfare; supplying the necessary food, clothing and medical care; providing an adequate domicile; and furnishing social or religious guidance. In re Adoption of Lybbert, 75 Wn.2d 671, 674, 453 P.2d 650 (1969).

The trial court found that Christina was currently unfit to parent C.J.S. There is substantial evidence to support this finding. While Christina clearly loved C.J.S., she had never parented him. Three times during the dependency, she failed to visit him for a period of over one month. She did not attend his medical appointments or arrange for appropriate daycare. She did not have a clear plan for paying for food and supplies. Whether her unfitness arises out of an unwillingness to parent, or an inability to parent, substantial evidence supports that Christina was not fulfilling her parental obligations. Under these circumstances, the Department met its burden to show that Christina is not currently fit to parent the child.

Christina contends that the trial court focused on C.M.'s unfitness, rather than her own. This is not a fair reading of the trial court's 203 findings of fact. Only 25 of the findings directly relate to C.M.'s criminal history, CPS history, and substance use. The trial court's findings relating to C.M. underscored Christina's understanding that her relationship with C.M. was a barrier to reunification with C.J.S. and that her choice of romantic partners was an ongoing parental deficit.

Christina also argues that the trial court impermissibly shifted the burden for Christina to show that she was fit to parent. The trial court did not indicate a shifting

in the burden of proof; it merely found that the Department established Christina was not currently fit to parent C.J.S. The fact that the most compelling evidence the Department presented was Christina's actions and inactions during the dependency does not mean the trial court shifted the burden of proof to her.

F.     Ineffective Assistance of Counsel

Christina argues that her counsel was ineffective for failing to object to CASA testimony regarding C.M.'s substance use, which she characterizes as improper expert testimony. Parents have a statutory right to representation by counsel at all stages of a dependency proceeding. RCW 13.34.090(2); In re Dependency of V.R.R., 134 Wn. App. 573, 581, 141 P.3d 85 (2006). This right includes the right to effective legal representation. Id. at 580.

To prevail on a claim of ineffective assistance of counsel, Christina must show (1) deficient performance by counsel and (2) resulting prejudice. In re Dependency of S.M.H., 128 Wn. App. 45, 61, 115 P.3d 990 (2005). There is a strong presumption of effective representation, and Christina has the burden to show that there are no legitimate strategic or tactical reasons for the challenged conduct. State v. McFarland, 127 Wn.2d 322, 335–36, 899 P.2d 1251 (1995). If counsel's conduct can be characterized as legitimate trial strategy, it cannot provide the basis for a claim of ineffective assistance of counsel. State v. Aho, 137 Wn.2d 736, 745, 975 P.2d 512 (1999).

During her investigation, the CASA met with C.M., who told her that he had been clean and sober for 15 years. At trial, C.M. testified that he occasionally uses marijuana and drinks alcohol. When asked about C.M.'s testimony, the CASA said, "Clean and sober to me means just that, clean and sober . . . [C.M.'s]

testimony today also was that he had never had a drink with [Christina]. [Christina] testified the first day that they had a drink over dinner not too long ago. That also is not clean and sober to me."

Arguably, the CASA was offering testimony in the form of an opinion regarding a witness's credibility and such testimony is typically inadmissible. State v. Sutherby, 138 Wn. App. 609, 617, 158 P.3d 91 (2007), aff'd, 165 Wn.2d 870, 204 P.3d 916 (2009). But the decision of when or whether to object is a classic example of trial tactics. Only in egregious circumstances, on testimony central to the State's case, will the failure to object constitute ineffective assistance of counsel. State v. Madison, 53 Wn. App. 754, 763, 770 P.2d 662 (1989). We do not find this case to present such egregious circumstances.

Moreover, we do not find that Christina has demonstrated prejudice. The trial court found that C.M.'s admission that he smokes marijuana and drinks alcohol to be concerning given his prior addiction to these substances. It also was concerned because of Christina's history of neglecting her prior children, and her primary parenting deficiencies of neglecting C.J.S. and choosing unsafe partners. There is no reason to believe the trial court's ruling would have been any different had Christina's counsel raised an objection to the CASA's testimony.

Christina also argues that counsel was ineffective for failing to cross-examine the CASA about misconduct within the Snohomish County Volunteer Guardian ad Litem program. Christina argues that defense counsel should have questioned the CASA about "systemic deception and misconduct" within the Snohomish County program. How to cross-examine a witness is generally a matter of judgment and strategy. See In re Pers. Restraint of Davis, 152 Wn.2d

647, 720, 101 P.3d 1 (2004). Christina has not demonstrated what impact, if any, past misconduct within the VGAL program had on any of the work the CASA did or any testimony she provided in this case. She has thus not demonstrated her counsel was deficient for failing to cross-examine the CASA about the prior misconduct.

We affirm.

Andrus, J.

We concur: